Charles E. JOHNSON, Plaintiff-Appellee,

v.

GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 89, Defendant-Appellant.

Charles E. JOHNSON, Plaintiff-Cross-Appellant,

v.

GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 89, Defendant-Cross-Appellee.

Nos. 73–1245, 73–1246.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1973.

Decided Nov. 30, 1973.

Ralph H. Logan, Louisville, Ky., for defendant-appellant; Hardy, Logan & Hastings, Louisville, Ky., on brief.

James R. Voyles, Louisville, Ky., for plaintiff-appellee; S. Arnold Lynch, Sales, Lynch & Fowler, Louisville, Ky., on brief.

Before PHILLIPS, Chief Judge, and McCREE and MILLER, Circuit Judges.

PHILLIPS, Chief Judge.

This is an action against a labor union for alleged violation of its duty of fair representation of a member in processing a grievance against his employer. Jurisdiction is based on § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) et seq.

Charles E. Johnson was discharged for participating in a wildcat strike in violation of the no-strike clause contained in the collective bargaining agreement between his employer and his Union. Johnson joined in picketing on the premises of his employer, shouted at non-striking employees entering the plant, and refused to obey an order restraining picketing issued by a State Circuit Court.

Following his discharge, Johnson filed a grievance which was processed by the Union through the first three steps of the grievance procedure prescribed by the collective bargaining agreement. The fourth step in this contract provides for arbitration. Because Johnson had participated in the wildcat strike in violation of the collective bargaining agreement and because the employer had not been guilty of any violations of the contract, the Union refused to demand arbitration. This is the established policy of the Union in handling a "hat in hand" grievance where an employee has violated a collective bargaining agreement and the employer has not been guilty of any violations.

The District Judge denied a motion for a directed verdict and submitted the case to the jury, which returned a verdict in favor of Johnson and against the Union for $7,339.40, including $5,572.19 for lost wages and $1,767.21 in lost fringe benefits. The District Court overruled the Union's motion for judgment n. o. v. and entered judgment in the amount found by the jury.[1]

The Union appeals from the judgment. Johnson cross-appeals from the action of the District Court in refusing to allow him a recovery against the Union of attorney's fees, expenses and prejudgment interest.

We reverse the judgment against the Union.

A breach of the statutory duty of fair representation occurs only when

1. The employer orginally was a party defendant. The action between Johnson and the employer was compromised and settled before trial.

the conduct of a union toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 350, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S. Ct. 681, 97 L.Ed. 1048 (1953); Dill v. Greyhound Corp., 435 F.2d 231, 238 (6th Cir. 1970); St. Clair v. Local Union, 422 F.2d 128, 130 (6th Cir. 1969); Balowski v. International Union, 372 F.2d 829, 833–834 (6th Cir. 1967); Williams v. Kroger Co., 369 F.2d 85, 87 (6th Cir. 1966).

In Ford Motor Co. v. Huffman, *supra,* the Supreme Court said: "A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. at 338, 73 S.Ct. at 686.

In Vaca v. Sipes, *supra,* the Court said: "Nor do we see substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration. For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." 386 U.S. at 192, 87 S.Ct. at 918.

There is no evidence in the present record from which the jury could have found the Union guilty of arbitrary, discriminatory or bad faith conduct toward Johnson or other members of the collective bargaining unit within the meaning of *Vaca, Humphrey* and the other decisions cited above.

Article XV of the collective bargaining agreement provides that:

"Except as provided in Step 4 of the grievance procedure, there shall be no strike on the part of the Union or lockouts on the part of the Employer, during the life of this Agreement . . . . This provision will in no way conflict with Management's rights as provided for in Article XII."

The latter article provides for a right to "hire, assign, transfer, promote, discharge or discipline for just cause."

In violation of the no-strike clause, certain employees, including Johnson, engaged in a four-day unauthorized strike beginning Monday, September 8, 1969. The cause of the strike is said to have been the action of management in closing one door to the plant which previously had been available to employees. The incident of the closed door was processed through the grievance procedure provided in the contract and finally was submitted to arbitration. The dispute over the closed door was determined in accordance with the provisions of the contract. The trouble which resulted from the discharge of Johnson began when certain members of the Union struck because the door had been closed, without pursuing the grievance procedure as required by the contract. Leonard McCracken, Business Agent for the Union, testified that he told the employees to go back to work on the day the strike began, but they refused to do so.

On September 10 the Circuit Court of Jefferson County, Kentucky, issued a temporary restraining order enjoining employees from continuing the strike, from blocking entrances, or harassing or interfering with any other employees seeking to enter the premises.

The record shows that, in addition to striking and picketing, Johnson stood in or near the doorway to the plant and shouted at employees who were returning to work in compliance with the State court restraining order. When handed the restraining order, Johnson demanded to know if the closed door had been opened, and when informed that it had not, he threw the restraining order to the ground and continued to engage in loud and obnoxious conduct. He admit-

ted that he had drunk two and possibly three beers shortly before this incident.

Rather than showing bad faith on the part of the Union, as asserted by Johnson, the record demonstrates diligent and effective efforts by the Union on behalf of all its members who engaged in this unauthorized strike. The employer undoubtedly had the right to discharge every employee who participated in the strike. The Union succeeded in preventing the discharge of any employee except Johnson. The other striking employees were merely disciplined.

At one stage of the dispute certain employees filed a charge against the employer with the National Labor Relations Board. On November 14, 1969, the Regional Director ruled as follows:

"The above-captioned case charging a violation under Section 8 of the National Labor Relations Act, as amended, has been carefully investigated and considered.

"The investigation discloses that on September 8, 1969, and for three days thereafter, you, along with the other employees named in the charge engaged in an unauthorized strike in violation of the existing contract between the Employer and your Union. It is clear from the evidence that the work stoppage was not caused by any unfair labor practices on the part of the Employer. The strike, therefore, constituted unprotected activity against which the Employer was privileged to take defensive action by suspension and discharge of those who engaged in the unprotected activity."

No review was sought from this action of the Regional Director.

With respect to Johnson, the record shows that the Union processed his grievance through the first three steps of the grievance procedure prescribed by the collective bargaining agreement. Three or four meetings were held at the step three level. The Union undertook to persuade the employer to reinstate Johnson but these efforts were unsuccessful. The employer adhered to its de-

cision to discharge Johnson for his misconduct in the picket line and his participation in the illegal strike. At the final meeting at the step three level on October 7, 1969, which was attended by Johnson, the following written disposition of his grievance was made: "Because of his participation and his conduct during the illegal work stoppage during the week of 9/8/69 the aggrieved is terminated." This disposition was signed by two representatives of management and by Leonard McCracken, Business Agent for the Union. This third step disposition was accepted by the Union.

Demands to pursue the grievance to arbitration were rejected by the Union.

The refusal of the Union to pursue the grievance to arbitration is supported by the decision of the Supreme Court in Vaca v. Sipes, *supra*, 386 U.S. at 192, 87 S.Ct. 903, and by the decision of this court in Amanda Bent Bolt v. United Auto Workers, 451 F.2d 1277 (6th Cir. 1971).

Mr. McCracken testified as follows as to the efforts of the Union on behalf of the grievance of Johnson:

"Q. In your duties assigned to you as a Business Agent, were you the agent in charge of the Fawcett Printing Corporation in the period of 1969 when this strike took place?

"A. Yes, sir.

"Q. When did you first hear that there was a work stoppage in September of 1969?

"A. I believe it was on the evening of September the 8th.

"Q. Do you know what day of the week that was?

"A. I believe it was a Monday.

\* \* \* \* \* \*

"Q. All right. Did you ever tell the employees to go back to work?

"A. Yes.

"Q. And when did you first tell them to return to work?

"A. When I—when I found out what their problem was, I told them at that time to return to work.

"Q. Well, was that Monday night?

"A. Yes, sir.

"Q. And did they return to work?

"A. No, sir.

\* \* \* \* \* \*

"Q. All right. Did you come back on Tuesday?

"A. Yes, sir.

"Q. And were the men still out from work on Tuesday?

"A. Yes, sir.

"Q. Did you at that time tell any of the men that this was an unauthorized work stoppage?

"A. The men all seemed to know that it was an unauthorized work stoppage. We discussed the—they wanted to take the position that they were locked out, and I told them the front door was still open, which they all knew. Their argument wasn't a valid argument.

"Q. Did you ask them again to return to work?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. All right. What attracted your attention to Mr. Johnson on that Thursday morning?

"A. His conduct.

"Q. What—describe his conduct?

"A. He was using profanity, swearing at the secretaries, the office employees, as they went through the Eleventh Street entrance.

"Q. Now, where was Mr. Johnson at the time this was taking place?

"A. Down near the door and in the doorway.

\* \* \* \* \* \*

"A. There was possibly a dozen people gathered around wanting to talk to me. I asked them, I said, 'Can any of you all get Johnson out of the doorway, get him away from here.' "

\* \* \* \* \* \*

"Q. All right. Did you direct Mr. Johnson if he felt aggrieved to file a grievance?

"A. Yes, sir.

"Q. Did he file a grievance?

"A. Yes, sir.

"Q. Was a hearing held on that grievance?

"A. Yes, sir.

"Q. Tell me how many hearings were held, where·they were held and who was present?

"A. The hearings were held at the office of the Labor Relations Director at Fawcett Printing Company.

"Q. All right.

"A. We had a meeting on September the 15th, I believe was the day, and present were Owen Swanson, Art Young and James Pike for the company.

"Q. Now, was that a third-step meeting?

"A. Yes, sir.

"Q. All right.

"A. For the union, there was myself and the chief stewards, Leroy Jeffers and Dennis Wright.

"Q. All right. Now, was other members' cases, as well as Jeffers', discussed —I mean, as well as Johnson's discussed on that occasion?

"A. Yes, sir.

"Q. Were they cases arising out of this same strike?

"A. Yes, sir.

"Q. All right. Now, what disposition was made of Mr. Johnson's case on that date?

"A. None.

"Q. All right. Was any disposition made—why were you talking about some of the other people if only Johnson filed a grievance?

"A. We were trying to get the company to be as lenient as possible with all of the employees that they had intended to take disciplinary action against.

"Q. At that time had they actually sent out disciplinary notices?

"A. I believe so.

"Q. All right. Now, did you subsequently or after that date, have another Step 3 meeting with the company?

"A. Yes, sir; on September the 18th, I believe.

"Q. All right. Did you know who was present on that date?

"A. Mr. Swanson, Mr. Young, and during these meetings there was one meeting when Mr. Pike wasn't there, but a Dennis Rollins was for the company.

"But in the second Third Step grievance meeting we had pertaining to Johnson, for the union there was myself, Leroy Jeffers and Dennis Wright.

"Q. At that time Jeffers was chief steward, is that correct?

"A. Yes, sir.

"Q. All right. Now, what matters were discussed at that meeting?

"A. The disciplinary action, the discharge of Johnson and the discharge of Washington Spencer.

\* \* \* \* \*

"Q. All right. Now, was there later another Step 3 grievance hearing with the company with reference to any of these employees?

"A. Yes, sir.

"Q. All right. When was that and who was considered—what was the consideration on—what happened on that occasion?

"A. That was on September the 29th. Prior to that time Mr. Johnson and myself had had telephone conversations, and he wanted to come to the meeting and plead his case.

"Q. All right.

"A. And I told him what time the meeting was and to be there.

"On that particular day, for the company, Mr. Swanson, Mr. Art Young—and I don't know who the third member from management was; either Mr. Pike or Mr. Rollins.

"Q. All right.

"A. Myself, from the union. Mr. Jeffers had been suspended.

"Q. By whom?

"A. By the company.

"Q. All right.

"A. Mr. Sanders appeared at the meeting and told me that the Cheshire employees had sent him to replace Jeffers in this meeting as chief steward, which was usually what happened if something happened to one of the chief stewards, one of the day shift stewards from the department the chief steward is from would come in and set in his place on the Grievance Committee.

"Q. All right. Now, did Mr. Johnson appear?

"A. Yes, sir.

"Q. Was his case presented on this third Third Step meeting?

"A. Yes, sir.

"Q. What was the request of the union on that occasion?

"A. That he be put back to work.

"Q. And was Mr.—Mr. Johnson was in the room?

"A. Yes, sir.

"Q. Did he offer any evidence?

"A. No.

"Q. I believe he testified something about he asked for Mr. Jeffers. Do you recall what that situation was?

"A. No.

"Q. Did he request Mr. Jeffers be brought in, in your presence?

"A. I don't recall it.

"Q. Now, did you—there's some question about whether there was any investigation made of Mr. Johnson's case. What did you know about Mr. Johnson's case when you went into that—these—all of these grievance steps, Third Step hearing?

"A. Mr. Johnson had been discharged for his participation in and his action during an illegal work stoppage.

"Q. Did you know that he had participated in an illegal work stoppage?

"A. Yes, sir.

"Q. Did you know what his conduct was that the company complained of?

"A. I seen some of his conduct that the company complained of.

"Q. Now, you're talking about the Thursday morning actions you have described?

"A. Yes, sir.

"Q. Did the company subsequently make a decision on Mr. Johnson's grievance? Did they make a decision on the grievance?

"A. They made a decision—the company had made their decision when they discharged him. Their position never changed.

"Q. All right. Now, at this point then did the union agree with the company that they had the right to discharge Johnson?

"A. No.

"Q. At any point did you so agree?

"A. Later.

"Q. All right. Now, can you tell us why you, as the union representative, agreed that the company was proper or had the right, whether it was proper or not, to discharge Johnson?

"A. Please restate your question.

"Q. Well, let me make—see if I can simplify it. Why didn't you go on to arbitration?

"A. It is not the policy of the union to arbitrate any disciplinary action taken by any employer against an employee who is involved in an illegal work stoppage.

"Q. All right. That was your reason?

"A. Correct.

"Q. And the company's reason was what? In addition to that, did they have another reason? Did the company say why they were doing this to Johnson and not to anybody else?

"A. Just because of his actions and his participation in it.

"Q. All right. Could you then and can you now point to a violation of the contract in effect by the company as to Mr. Johnson?

"A. No.

"Q. To arbitrate a case, in your experience as a Business Agent, is it necessary to show a violation of the contract by the company?

"A. Yes.

\* \* \* \* \* \*

"Q. All right. Did you treat Mr. Johnson any different from any other employee in representing them in the grievance procedures?

"A. No, sir.

"Q. Did you do all you knew how to do to try to assist in getting Mr. Johnson re-employed by the company?

"A. Yes, sir. This was the reason that we had four Third Step grievance meetings pertaining to Mr. Johnson instead of one.

"Q. Did you—well, just what did you say to the company in trying to get them to not be as severe on Mr. Johnson?

"A. We had a hat-in-our-hand grievance. We didn't have a demanding type grievance where the company had violated any article or section of the contract. And what they did, they had a right to do, the action that they had taken. Therefore, all that we could do was ask them to reconsider this—the action that they had taken and to consider this man's family. And we approached this from that line, that we had a hat-in-our-hand grievance from the beginning, and we knew it. And all that we could do was beg for the man's job back."

Accepting the testimony of Johnson and his witnesses at face value, which the jury was entitled to do, and considering this testimony in the light most favorable to Johnson, we determine that his evidence was insufficient to make out a cause of action against the Union under the authorities hereinabove discussed.

Much of Johnson's testimony was directed toward the failure of the Union to demand arbitration. As stated above, the action of the Union in refusing to submit the grievance to arbitration is supported by Vaca v. Sipes, *supra*, 386 U.S. at 192, 87 S.Ct. 903, and Amanda Bent Bolt v. United Auto Workers, *supra*, 451 F.2d 1277 (6th Cir. 1971).

There is a conflict in the testimony as to whether Johnson used profane language and obscenities in shouting at returning workers. He admitted that he called the returning workers "scabs" and dropped to the ground the copy of the State court restraining order. He also admitted drinking two or three beers between 7:00 and 8:30 a. m. on the morning of the picketing. His discharge at the end of the step three proceeding was "[b]ecause of his participation and his conduct during the illegal work stoppage." There was no finding that he used profanity and this does not appear to have been a controlling issue.

Johnson asserts that he was denied the right to be heard and to present witnesses. The Collective Bargaining Agreement contains the following provisions concerning the first three steps of processing a grievance:

"Step 1. The aggrieved employee shall present his grievance to his foreman orally immediately, but not later than one day after the employee has knowledge that a grievance exists. The aggrieved employee's shop steward shall have an opportunity to be present.

"Step 2. Failure to resolve the dispute in Step 1, hereof, the grievance shall be reduced to writing and shall be discussed between the superintendent, the chief steward, the aggrieved employee or employees and the shop steward within five working days from the filing of the grievance. Any disposition of the grievance at this step shall be reduced to writing.

"Step 3. Failure to resolve the dispute in Step 2, hereof the grievance shall be discussed at the next regular monthly meeting of the Grievance Committee, composed of the business agent and chief stewards, representing the Union and three representatives of the Employer, one of which is the Director of Industrial Relations. At this hearing either party shall have the right to present their evidence by testimony from the aggrieved employee or any supporting witness. A majority decision by this committee shall be final and binding on all parties. In the event there is no majority decision, the dispute shall be considered deadlocked and may be settled by an arbitrator as provided for in Step 4 hereof. Any disposition of the grievance in this Step 3 shall be put in writing."

In step three proceedings either the company or the Union had the "right to present their evidence by testimony from the aggrieved party or any supporting witness." Aggrieved employees are not parties to the contract. The record shows that three or four meetings were held at the step three level. Johnson was present at the last of these meetings and asked to be reinstated. In spite of the efforts of the Union on behalf of Johnson, the Committee remained deadlocked as to his grievance.

Johnson relies upon Griffin v. International Union, 469 F.2d 181 (4th Cir. 1972). In Balowski v. International Union, *supra,* this court said: "Whether a bargaining representative has acted fairly, impartially and without hostile discrimination depends upon the facts of each case." 372 F.2d at 834. The facts of *Griffin* are readily distinguishable from the facts of the case at bar.

Johnson charges discrimination because he was the only striking employee who was not returned to his job. As said by the Supreme Court in Ford Motor Co. v. Huffman, *supra:* "The complete satisfaction of all who are represented is hardly to be expected." 345 U.S. at 338, 73 S.Ct. at 686. The record demonstrates that the discharge of Johnson came about as a result of his own misconduct despite the persistent but unsuccessful efforts of the Union in support of his "hat–in–hand" grievance.

We hold that there is insufficient evidence in this case to warrant taking it to the jury. The District Court erred

in refusing to grant the motions for a directed verdict and for judgment n. o. v. The cross-appeal of Johnson for attorney's fees, expenses and prejudgment interest is dismissed. The judgment of the District Court is reversed and the case is remanded with instructions to dismiss the complaint.