Charles L. **EASLEY** and Louis Sanchez

v.

**DISTRICT 50, ALLIED AND TECHNICAL WORKERS et al.**

Civ. A. No. 71–55.

United States District Court,
M. D. Louisiana.

June 13, 1974.

James D. Thomas, II, Dodd, Hirsch, Barker, Avant & Wall, Baton Rouge, La., for plaintiffs.

Victor H. Hess, Jr., Jackson & Hess, New Orleans, La., John C. Falkenberry, William E. Mitch, Cooper, Mitch & Crawford, Birmingham, Ala., for defendants.

E. GORDON WEST, District Judge:

This is an action by two former employees of Allied Chemical Corporation based upon the alleged failure of their union, District 50, Allied and Technical Workers, and Local Union No. 12371, Allied and Technical Workers, to properly represent them at an arbitration hearing growing out of their discharge from employment by Allied Chemical Corporation. The case was tried to this Court, without the intervention of a jury, on March 20, 1974, and now, after due consideration of the evidence presented at that trial, it is the conclusion of this Court that the plaintiffs have failed to carry the burden of proving that they were not properly and adequately represented during the arbitration proceedings.

The plaintiff, Charles L. Easley, had been employed by Allied for approxi-mately 19 years prior to his termination on April 17, 1970. He was a first class instrument man, but for approximately 17 years had been the union steward in the meter and instrument section. As a steward, he was also on the Union Grievance Committee. The various stewards in the plant elect a chairman from among their numbers for the Grievance Committee, and Easley had held the position of chairman of the Grievance Committee for about two years prior to his discharge. By tradition at the Allied plant, the chairman of the Grievance Committee is not assigned any work in his trade, but spends full time on union affairs. The same is true of the president of the local union, who, at that time, was Tim Linscomb. These people were paid the wages of their trade but spent full time on union business.

Louis Sanchez, the other plaintiff, had worked for Allied approximately 16 years, but had not worked at the main plant. He worked at the brine wells, which is located about five miles west of Plaquemine, Louisiana. He was elected section representative of the brine wells section and thus was also on the Grievance Committee. He was also elected vice-president of the local union and was serving in that capacity when his employment was terminated. In the absence of the president, Tim Linscomb, Sanchez acted as president and while doing so, he devoted full time to union affairs and was paid the regular wages of his trade. During the week of April 6 through April 12, of 1970, Sanchez was acting as union president while Linscomb was out of town attending a union convention.

On or about April 8, 1970, the company superintendent of the maintenance department asked an employee, Mr. Fleming, to perform a certain job (cutting gaskets), which Mr. Fleming did not believe was within his scope of work. He refused to do this job even though Sanchez suggested to him that he do the job under protest. Sanchez, however, made it clear that he would de-

fend him to the best of his ability if he felt that he should not perform this work. Mr. Fleming did not perform this work, and two days later, on or about April 10, 1970, the superintendent again asked Mr. Fleming to do this same work, and when he refused, he asked a Mr. Daigle, another employee, to do it, and he also refused. When they refused, the two men, Mr. Fleming and Mr. Daigle, were instructed to "punch their cards out." Mr. Sanchez believed that the company had no right to do this without first having a hearing before the Grievance Committee. The two employees, Fleming and Daigle, did leave the plant, and then, on Monday, the 13th of April, a meeting was held between management and the union pertaining to the Fleming-Daigle incident. By that time, Mr. Linscomb, the union president, was back in town, but he asked Mr. Sanchez to attend because he, Sanchez, knew more about the incident. The plaintiff, Charles Easley, was also present at this meeting as were the two employees, Fleming and Daigle. As a result of this meeting, Daigle and Fleming were suspended for an additional five days, and a grievance was filed in connection therewith. Tom Johnson, the International Union representative, was also present at that time, and after this meeting, practically all of the union personnel at the plant walked out into the street where they held a "street meeting." There is little doubt that it was Tom Johnson, the International Union representative, who, at that time, suggested that the employees "pull a sickout" and not report to work. This, of course, was an illegal work stoppage and in violation of the collective bargaining agreement between the union and the company. The illegal work stoppage was 100 per cent effective both in the brine wells section and in the meter and instrument section, and it was the position of the company that this could not have been so without the active support of both Sanchez and Easley. As a result of these activities, the company sent written notice to both Mr. Sanchez and

Mr. Easley on April 17, 1970, that their employment with the company was terminated. Grievances were filed and the question of these discharges went to arbitration on September 9, 10, and 11, of 1970. On October 14, 1970, the arbitrators concluded that "The discharges of Louis Sanchez and Charles Easley were for just cause. Their grievance is denied." Thereafter, both plaintiffs filed the present suit claiming that the union failed to properly represent them at these arbitration hearings.

The main contention of both plaintiffs is that the illegal work stoppage was not their idea, but was the idea of Tom Johnson, the International Union representative. Both plaintiffs were represented at the arbitration hearing by Mr. Robert D. Manning, an attorney from Boston, Massachusetts, who specialized in labor law. The plaintiffs contend that Mr. Manning had a conflict of interest, and that in order to protect the interest of the union, he failed to properly represent plaintiffs as individuals before the arbitration proceeding. The basis of the argument is that since Mr. Tom Johnson, the International Union representative, was solely responsible for the calling of the illegal work stoppage, it was necessary for Mr. Manning to protect Mr. Johnson so that the company would have no grounds for filing a damage suit against the union. The plaintiffs contend that they wanted to take the witness stand during the arbitration hearing in order to testify that it was not they who had called the work stoppage but that it was Mr. Johnson who had done so. They contend that Mr. Manning did not permit them to so testify, and that thus they were improperly and inadequately represented by Mr. Manning. But a close analysis of the arbitration award does not support the plaintiffs' contentions.

The arbitrators found that Sanchez and Easley were discharged for just cause not because they had instigated an illegal work stoppage, but because, after the work stoppage was in progress, neither Sanchez nor Easley took any steps

as union representatives to terminate the stoppage. The arbitrators specifically concluded that neither Sanchez nor Easley had suggested or instigated the work stoppage. But they point out overwhelming evidence of the fact that the complete effectiveness of the work stoppage in both the brine wells section and the meter and instrument section could only have been possible if they had the blessing of Mr. Sanchez and Mr. Easley. This finding could have in no way been changed or affected by testimony from either Mr. Easley or Mr. Sanchez that it was Tom Johnson, and not they, who had initially called for the work stoppage. In addition to this, there is every reason to conclude that the matter of whether or not the attorney, Mr. Manning, would permit these plaintiffs to testify, was purely a matter of professional judgment, and there is no indication that his judgment was influenced by any conflict of interest.

Mr. Manning is an accomplished labor lawyer who has handled over 2,000 grievance cases. He was sought out by these plaintiffs even though he was, of course, paid by the union because of the fact the union owed the plaintiffs representation. Both plaintiffs testified that other attorneys had been suggested, but they, the plaintiffs, after what they called a thorough investigation, concluded that they wanted Mr. Manning as their attorney. They were perfectly satisfied with Mr. Manning, especially when they gained the impression that Mr. Manning was a personal friend of one of the arbitrators. As it turned out, he was, indeed, a friend of one of the arbitrators, but as the final opinion and decision of the arbitrators eloquently confirms, their personal friendship in no way influenced the professional responsibility of either of them. After the hearing was over, both the plaintiffs and Mr. Manning were convinced that they had won their case, and indeed, in retrospect, it was perfectly reasonable that they should have felt that way.

It was apparently the opinion of everyone concerned that the whole case would turn on whether or not the plaintiffs, Easley and Sanchez, were responsible for instigating the illegal work stoppage. Mr. Manning was, of course, faced with a situation that he felt he must "play by ear" as is the case in practically all litigation. The progress of the suit largely determines whether or not certain witnesses must be used or whether the use of certain witnesses would hurt rather than help in a particular situation. In this case, when Mr. Manning called Tom Johnson as a witness, the testimony was uncontradicted to the effect that neither Mr. Sanchez nor Mr. Easley had suggested or instigated the work stoppage. As it turned out, it was the opinion of the arbitrators that the plaintiffs had not suggested or instigated the work stoppage. Thus, Mr. Manning concluded that there was no reason to elicit the same testimony from the plaintiffs and at the same time subject them to complete cross examination which, it appeared at the time, could not in any way help the plaintiffs. The testimony of Mr. Johnson needed no corroboration as it was uncontradicted. As seen by the final award, Mr. Johnson's testimony did indeed stand up. The only testimony that the plaintiffs stated they wanted to give was testimony which would clear them of any complicity in instigating the illegal work stoppage. Mr. Manning decided, and rightly so, that this testimony from these plaintiffs was not essential.

██ Strictly by hindsight, it now appears that there might have been some remote possibility that testimony of the plaintiffs could have been used in an attempt to exonerate them from the arbitrator's conclusion that after the strike was called, it was successful only because it later acquired the blessing of Mr. Sanchez and Mr. Easley. But whether or not, even in hindsight, their testimony could have helped them in that regard, is speculative. There is a great possibility, after reviewing the arbitrator's award, that subjecting these plaintiffs to unlimited cross examination on that issue might well have strength-

ened rather than have weakened the company's position. The fact that the plaintiffs now disagree with the trial strategy used by Mr. Manning does not lead to the conclusion that they were improperly represented by Mr. Manning. Mr. Manning was an expert in his field, and a close review of the record certainly justifies the conclusion that he used reasonably good judgment in the development of his trial strategy. He simply lost a law suit which is not unusual for the best of attorneys. The plaintiffs were surprised that they lost, and so was Mr. Manning. But lose they did.

In the brief filed with this Court, plaintiffs' counsel states that the plaintiffs do not contend that this Court should re-try the same issue which was presented to the arbitrator. The issue there was whether or not the discharge of the plaintiffs was lawful. Plaintiffs' counsel states in his brief that the issue before this Court is simply whether or not the defendant union acted in good faith in its representation of the plaintiffs in the arbitration proceedings. As stated in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967):

> "It is now well settled that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees both in its collective bargaining with Swift (citations omitted) and in its enforcement of the resulting collective bargaining agreement (citation omitted) * * * . Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

Plaintiff cites Vaca as being a statement of the obligation of the union to these plaintiffs, and also cites the case of Griffin v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, 4 Cir., 469 F.2d 181, as further defining the "duty of fair representation." In Griffin the Court said:

> "The repeated references in Vaca to 'arbitrary' union conduct reflected a calculated broadening of the fair representation standard. (Citations omitted.) While negligence in handling grievances has not been identified as breaching the union's duty of fair representation, Bazarte v. United Transportation Union, 429 F.2d 868, 872 (3 Cir. 1970), the courts have adopted the position that a union may not arbitrarily ignore a meritorious grievance or handle it in a perfunctory manner."

The Court, in Griffin, then proceeded to state:

> "For a successful suit against a union for breach of its duty of fair representation, the employee 'must also have proved arbitrary or bad faith conduct on the part of the union in processing his grievance.'"

Thus, even under plaintiffs' appreciation of this case, in order for them to be successful herein, they must carry the burden of proving that the defendant union acted arbitrarily or in bad faith before they can successfully show a failure on the part of the union to fairly represent the plaintiffs in these arbitration proceedings. There is nothing in this record that could possibly be construed as indicating arbitrariness or bad faith on the part of the unions or on the part of Mr. Manning in these proceedings. First of all, as far as the defendant union is concerned, they permitted the plaintiffs to select the lawyer whom they wished to defend them, and they permitted the plaintiffs to select the independent arbitrator. There is certainly no indication in this record that Mr. Manning in any way conspired with the union or attempted to do its bidding in any way adverse to the interest of these plaintiffs. As a matter of fact, it was almost as much to the interest of Mr. Manning and to the defendant unions that they win the arbitration as it was to the interest of the plaintiffs.

At the time of this arbitration, there were serious union problems at the Allied plant, and another union was attempting to raid the defendant union's membership. In such a situation, where the defendant union was fighting for its very life at the Allied plant, nothing could be more important to it than proving to its members that they were ready, willing and able to defend its members when they needed defending in grievance and arbitration proceedings. They attempted to do this by permitting the plaintiffs to select their attorney who was certainly an attorney with unquestioned qualifications in the field of labor law. Secondly, Mr. Johnson, the International Union representative, testified for the plaintiffs and his testimony absolved the defendants from all the blame in the instigation of the illegal work stoppage. This was what all parties, at that time, considered to be the most important aspect of the case. The fact that there was later a difference of opinion between the plaintiffs and their attorney, Mr. Manning, as to whether or not the plaintiffs should have testified, is certainly no indication of "arbitrariness or bad faith" on the part of the defendant union. Even if the evidence had shown that the defendant union or Mr. Manning acted negligently or exercised poor judgment, this in itself would not support a claim of unfair representation. Bazarte v. United Transportation Union, 429 F.2d 868, 872 (CA3–1970). But we hasten to add that in the opinion of this Court, there was no showing whatsoever that Mr. Manning acted negligently or exercised poor judgment in this case. Based upon the evidence before this Court, including the reasons given by the arbitrators for their decision, there could be nothing to justify this Court in substituting its judgment on the merits of the case for that of the arbitrators, or for the decision of Mr. Manning, who used his professional judgment as to how the arbitration proceedings should be conducted. The fact is that there is no showing of any kind that either the union or Mr. Manning acted arbitrarily or in bad faith. The Court concludes, as a matter of law, that the defendant union discharged completely its legal obligation to fairly and adequately represent the plaintiffs in their dispute with their employer, Allied Chemical Company. There is no evidence in this case to support, either as a matter of fact or as a matter of law, that there was any conflict of interest on the part of Mr. Manning that in any way affected his representation of the plaintiffs in the arbitration proceedings. The reasons given by the arbitrators for their award set forth in detail the strenuous defense made for these plaintiffs by Mr. Manning. A vigorous defense of their position was presented to the arbitrators, and they simply concluded, for the reasons stated in their opinion, that their discharge was for good cause. Just as this Court cannot conclude that the defendant unions did not provide adequate representation for the plaintiffs, neither can it conclude from the evidence in this case that the arbitrators' award was not justified. For these reasons judgment will be entered herein rejecting the demands of the plaintiffs and dismissing this suit at plaintiffs' cost.