**William Lee STEED, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., a corporation, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Teamsters Local Union No. 175, Defendants.**

Civ. A. No. 78–1001.

United States District Court,
S. D. West Virginia,
Bluefield Division.

April 24, 1981.

Fred O. Blue, Bluefield, W. Va., for plaintiff.

Joseph E. Santucci, Jr., Washington, D. C., Martin C. Bowles, Roger A. Wolfe, Charleston, W. Va., for defendants.

## MEMORANDUM OPINION AND ORDER

KIDD, District Judge.

This action was commenced on January 6, 1978. The plaintiff claims first that he was wrongfully discharged by the defendant, United Parcel Service, Inc., his employer. Secondly, the plaintiff says he was not fairly represented by his Union, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 175, during the discharge proceedings.

By order entered on August 13, 1980, trial of the plaintiff's claims against the Union and Company were bifurcated. A trial to the Court was conducted on November 17 and November 18, 1980, on the sole issue of whether the defendant Union had fairly represented the plaintiff in grievance proceedings conducted pursuant to a contract existing between the party defendants.

Since resolution of this issue is largely factual, the Court's findings of fact will be set forth at some length.

## FINDINGS OF FACT

1. Prior to October 14, 1977, the plaintiff William L. Steed, was a truck driver (parcelman) employed by the defendant, United Parcel Service, Inc., (hereafter "Company"), and had been so employed for seven years.

2. The plaintiff, on and before October 14, 1977, was a member of Local 175 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereafter "Union").

3. The Company and Union were at all times pertinent hereto, signators to a collective bargaining agreement known as the *Eastern States Area Parcel Agreement* and supplement thereto, portions of which will hereafter be cited.

4. On the 14th of October, 1977, the plaintiff reported to work as usual. On at least two occasions immediately prior to the incident which occurred on October 14, the plaintiff had requested of his supervisors that he be given time off from his work, citing as a reason, that he was extremely fatigued.

5. Very shortly after beginning work the plaintiff exhibited bizarre and seemingly violent behavior; the behavior was manifested by yelling, crying, threatening harm to fellow employees, throwing and kicking packages, waving a tire iron and similar acts. The plaintiff maintains that he does not remember any such conduct but does not offer evidence to refute its accuracy. No person was injured by the conduct described.

6. Medical testimony and other evidence reveals that prior to this time the plaintiff had no history of mental or emotional illness, other than periodic treatment for a nervous stomach; for this condition the plaintiff was taking Librax each day before meals. The plaintiff was depressed, fatigued and despondent prior to the day of the incident described. An adverse reaction to the medication could "possibly" have caused the plaintiff's behavior, according to a doctor's testimony in this trial.

7. Immediately subsequent to the incident, the plaintiff was discharged for "... serious threats to do bodily harm to ... fellow employees and ... center manager."

The effective date of discharge was October 14, 1977.[1]

8. On or about October 18, 1977, the plaintiff engaged the services of an attorney to process his grievance; there is no evidence that the plaintiff requested his Union to perform this service. Counsel did correspond with the Union and Company and assisted the plaintiff in filing his written grievance.

9. The evidence reveals that the plaintiff consulted with one or more of his Union officers or officials on some six or eight occasions, including the days of formal and informal hearings, for the purpose of discussing his grievance; these sessions were neither long nor involved.

10. The evidence does not suggest that the plaintiff ever voiced dissatisfaction with the aid and assistance of his Union.

11. The plaintiff testified that during the course of his employment all of his supervisors were "against him" (naming several of these persons) and stated that he was often harassed, criticized and intimidated, but further said that he was never disciplined by the Company, nor did he ever before file a grievance in response to this voiced misconduct of the Company.

12. Mr. Steed was represented at each stage of the grievance procedure by at least one Union official.[2] In fact, normally, there is but one Union representative who accompanies a grievant but Mr. Steed was represented by two such officials during critical stages of his case.

13. The final, and thus most critical, stage of the Steed proceeding was a hearing before a Union/Management six member panel.[3] At this hearing were two Company officials presenting the Company's position, and two officials of the Union and Mr. Steed to present the Union's position. A representative of each side summarized the respective positions and only Mr. Steed was called upon to testify.[4] Several Exhibits were offered as evidence by the Company, including 11 notarized statements of Union and Company employees which were contrary to the interests of Mr. Steed and a diagram of the work place where the October 14 incident occurred. A medical statement concerning the plaintiff was offered by the Union and was received and reviewed by the panel but was not made a part of the panel record because it was not notarized as required. Similarly, a somewhat favorable statement of the local union steward was permitted to be read into the record without proper authentication.

14. Upon answering questions by the parties and this Court, representatives of the Union testified that the Steed grievance was handled like all other grievances previously filed with little exception.[5] Further, there was testimony that the Union had offered to compromise the matter by agreeing that Mr. Steed would receive counselling or therapy; this proposal was rejected by the Company and the Union proceeded to process the grievance.

1. A mailogram was sent to the plaintiff on October 17, 1977, which officially notified him of his discharge as reflected by page 3 of Exhibit B of the defendant's answer 17 to plaintiff's interrogatories as received in this matter.

2. Article 6 of the *Eastern States Area Parcel Agreement*, covering "Grievance Procedure" provides for a four-step proceeding which may culminate in arbitration. Mr. Steed was represented through the first three steps, the third of which became final and binding according to the terms of the agreement.

3. The panel consists of three Union members and three Company members. In the event that a majority of the panel cannot agree on a decision, then the matter may be submitted to arbitration. Article 6, Sections 3 and 4 of the *Eastern States Area Parcel Agreement*. In the Steed case the vote was unanimous in upholding the discharge.

4. A witness for the defendant Union testified before this Court that the local had "never" before subpoenaed and paid the expenses of a witness to testify before the area panel.

5. The evidence shows the exceptions to be *in favor* of better-than-normal representation; for instance, the plaintiff was represented by two officials of the Union during critical stages of his grievance procedure, while standard practice was that one officer would represent the grievant.

## CONCLUSIONS AND OPINION

As previously stated, the only issue before the Court is whether the Union fairly represented the interests of Mr. Steed in processing his grievance.

■ This Court will follow the well established standard noted in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and followed in this Circuit.[6] In *Vaca*, the Court stated that:

. * * * * * *

"A breach of the statutory duty of fair representation occurs only when a Union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916.

* * * * * *

The *Vaca* court borrowed this language from, among others, *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), but seemingly expanded the standard somewhat by further stating:

* * * * * *

"Though we accept the proposition that a Union may not arbitrarily ignore a meritorious grievance or process it in a *perfunctory fashion*, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration ..." *Id.* 386 U.S. at 191, 87 S.Ct. at 917. (emphasis supplied) .

* * * * * *

Thus it would seem that "perfunctory" handling of a meritorious grievance, in addition to discriminatory, bad faith or arbitrary Union conduct, would establish unfair representation by the Union, and this has become a part of the unfair representation standard. *See e. g., Ethier v. United States Postal Service*, 590 F.2d 733, 735 (8th Cir. 1979). Judge Heaney, writing for the

Eighth Circuit in *Ethier*, adopted *Webster's* dictionary definition of "perfunctory", as "without concern or solicitude; indifferent." *Id.* at 736.

■ There are two basic ways that a Union might breach its duty of fairly representing a member. First, if the Union wrongfully refuses to process a grievance, at any stage, this would be unfair representation. The second way the Union breaches its duty is to fail to fairly represent a member during the course of the grievance process. *Margetta v. Pam Pam Corp.*, 501 F.2d 179 (9th Cir. 1974). The latter describes the plaintiff's assertion.

With those basics in mind, the Court must now decide whether the plaintiff did preponderate on proof offered to establish the level of representation.

The plaintiff says, *inter alia*, that the Union's failings included: not conducting a thorough investigation (not interviewing or subpoenaing favorable witnesses), not obtaining expert medical evidence, not assisting in filling out the initial grievance form, and prohibiting the plaintiff from being represented by counsel throughout the grievance proceeding.[7]

■ The Court finds no merit in the plaintiff's insistence that he was entitled to counsel during the grievance process. The plaintiff offered no evidence to support such entitlement. An officer of the defendant Union testified that lawyers are "not allowed" to participate in the grievance process until the stage of arbitration. This testimony is supported by plaintiff's Exhibit Number 4,[8] admitted in this matter. The contract is silent in this regard.

■ Likewise, the Union cannot be said to have been unfair in failing to fill out the plaintiff's grievance card. The evi-

---

**6.** *Griffin v. International Union of United Auto Workers*, 469 F.2d 181 (4th Cir. 1974).

**7.** Nowhere does the plaintiff expressly set forth these elements of unfairness. The Court has assumed, from the evidence, that these are the failings complained of. In his complaint, the plaintiff merely alleges that the Union "... failed to represent the plaintiff faithfully and

fully in the processing of his grievance." When the defendant company, by way of interrogatory, asked for the factual basis for this claim, the plaintiff did not offer greater detail.

**8.** Exhibit 4 is a letter from the Union to the plaintiff's counsel in which the Union insists that a grievant may not be represented by a lawyer.

dence shows that the plaintiff was discharged immediately after the October 14, 1977 incident. On October 18, 1977, the plaintiff engaged the services of a lawyer to assist in filing his grievance. At no time between the 14th and 18th of October did the plaintiff inform the Union that he was aggrieved by his discharge. There is no affirmative duty upon the Union to grieve in every case, and even in a discharge case (industrial capital punishment) the individual must inform his union of his displeasure with the company's action.

After the Union became aware of the plaintiff's grievance, they became bound to fairly represent the plaintiff. The plaintiff says that he was not fairly represented when the Union failed to use greater investigative effort and failed to call favorable witnesses, including the plaintiff's treating physician. The plaintiff has not shown that there was a lay witness (*i. e.*, fellow employee or bystander) who could have been of crucial assistance. The one possible favorable witness, a Union steward who witnessed the October 14, 1977 incident, did not testify before the joint panel, and, judging from his testimony before this Court, might have been of assistance to the plaintiff. However, as noted in the factual statement herein, and at the Union's insistence, a statement of the steward was read into the panel record even absent proper authentication. As to having the statement or testimony of a physician regarding the plaintiff's emotional history, the Court is of the opinion that such evidence might also have been useful. However, the Court is not now ready to second-guess the Union. The Union might have determined that expert evidence of a potentially dangerous emotional disability would have been detrimental to the plaintiff's cause. Furthermore, the assertions contained in the plaintiff's grievance form, the reason for discharge cited by the Company, and interviews with the plaintiff, may well have failed to put the Union on notice of the *possible* defense of emotional disability.

The Court might now concede that the Union did not present the best possible case for its member, Mr. Steed. However, proof of negligence or poor judgment are not sufficient to establish the claim of unfair representation. *Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335 (6th Cir. 1975). Furthermore, the Union's choice of strategy surely leaves something to be desired, but the district court should not infer from such choice an unfair effort on the part of the Union. *Cf. Walden v. Local 71, International Brotherhood of Teamsters,* 468 F.2d 196 (4th Cir. 1972). As repeatedly noted by the courts, the Union is given great discretion in their handling of grievances of their members, and courts are slow to interfere with the union's decisions in this regard. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), *quoting, Ford Motor Co. v. Huffman, supra.* This, naturally, stems from the national labor policy itself which favors resolving disputes within the industrial community and giving full effect to the bargained-for method of industrial self-government. *Hines v. Anchor Motor Freight, Inc., supra. See also, Cf., Buchanan v. N.L.R.B.,* 597 F.2d 388 (4th Cir. 1979).

In a very thorough writing dated July 9, 1979, general counsel for the National Labor Relations Board informed his regional directors of the guidelines which should be followed when determining whether to process unfair representation claims by union members.[9] Noting that the "... parameters of [the union's duty to fairly represent its members] remain confusing and unclear ...", counsel proceeded to define those nebulous parameters. The memorandum divides the unfair representation issue into four substantive categories including: improper motives or fraud, arbitrary conduct, gross negligence or improper conduct during the grievance procedure. Analysis of the standards set forth in this detailed memorandum still do not persuade the Court that Mr. Steed was not fairly represented by his union.

---

**9.** General counsel memorandum 79–55, *Memorandum of NLRB General Counsel Irving on*

*cases involving a Union's Duty of Fair Representation,* 7/9/79.

This Court cannot now analyze the record and evidence in this case and say that William Steed was unfairly represented by his Union. The Union's conduct was not so poor as to be "unfair" as judicially defined. However, had this plaintiff brought a private cause of action (as opposed to an "industrial cause of action") and been represented by an attorney, that attorney may well have been negligent. Often, industry has not bargained for skilled advocates to act as representatives in the grievance process; as a practical matter this is likely a wise choice. Counsel for the plaintiff insists that "mediocrity cannot be the standard" of industrial representation. While it is true that "mediocrity" is not the standard by which fair representation is measured, it is likewise true that mediocrity may often comply with the skill which has been bargained for.

It is the OPINION of the Court that judgment should be for the defendant Union, and it is hereby ORDERED that judgment be entered accordingly.

The Court is further of the opinion that, as a consequence of the disposition of the issue herein presented, the plaintiff's claim against the defendant Company must necessarily fail. As noted by the United States Supreme Court in *Hines v. Anchor Motor Freight, Inc., supra,* and others, maintenance of such a suit and usurping the finality provisions of the collective bargaining agreement is conditioned upon the employee's showing of unfair representation under that agreement.

It is, therefore, FURTHER ORDERED that judgment be entered DISMISSING the plaintiff's claims against the defendant, United Parcel Service, Inc.