**Marvin HAYES, Plaintiff,**

v.

**BAKERY CONFECTIONERY & TOBACCO WORKERS INTERNATIONAL UNION OF AMERICA, LOCAL 213 OF CINCINNATI, OHIO, and Ralston Purina Company, Bremner Division, Defendants.**

**Civ. A. No. C 85–0207–L(A).**

United States District Court,
W.D. Kentucky,
at Louisville.

Sept. 25, 1989.

Norman L. Belker, Belker & Associates, Louisville, Ky., for plaintiff.

Irvin H. Cutler, Jr., Segal, Isenberg, Sales, Stewart & Cutler, Louisville, Ky., David M. Cook, Kircher & Phalen, Cincinnati, Ohio, for Local 213.

Wm. A. Blodgett, Jr., Woodward Hobson & Fulton, Louisville, Ky., and Jeffrey P. Reinhard, St. Louis, Mo., for Ralston Purina Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Senior District Judge.

Plaintiff, Marvin Hayes, brings this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, alleging that he was discharged by the defendant, Ralston Purina Company ("Company"), in violation of its collective bargaining agreement with the defendant, Local 213, and that the defendant Union, of which he was a bona fide member, failed to comply with its duty of fairly representing him in his grievances regarding his termination and his suspension.

Plaintiff was first employed by the Company in 1975. In 1979 he was made a union steward, a duty which he subsequently relinquished. He was also a member of the union negotiating committee, which was to negotiate the terms of a new collective bargaining agreement to be entered into following the expiration of the 1983–85 collective bargaining agreement.

In September 1984, plaintiff was employed by the Bremner Biscuit Company, a subsidiary of Ralston Purina Company, as a porter in the cutting room. At that time, he was notified that he would be bumped from his position. Under the contract between the Union and the Company, he was then entitled to enjoy plant-wide seniority and to bump persons with less seniority. He chose to exercise his seniority by bumping Aaron Duke, who worked in the sanitation control unit. He was advised by Will Groover, who was to be his foreman in the sanitation control unit, that he would have fifteen days within which to train for the job, and that he would have to take a test in order to fully qualify for the job. He protested that fifteen days was not a sufficient time for training. His objection was rejected by the Company as were grievances which he filed during the period October 1, 1984 to November 30, 1984. Hayes claims that he assumed a grievance would be filed concerning the fifteen day training period.

On November 29, 1984, plaintiff was approached by Groover and told that he would have to go to Frankfort on the next day to take the test. He advised Groover that he wished to drive his own car to take the test and was asked whether he had liability insurance of $50,000. A call was made to his insurance company to determine whether he had this amount of insurance. When he discovered that he did not have this amount of insurance, he and Groover went to the Budget Rental Car office to rent a car for the drive to Frankfort the next day. When they arrived at the rental car agency, plaintiff did not have his driver's license and the contract to rent the car was apparently signed in Mr. Groover's name.

On November 30, plaintiff reported to work at 5:00 in the morning. He testified that he had on his blue shirt and that he was planning to drive to Frankfort to take the test. However, at 6:00 a.m., he was told that Groover would drive the car. Plaintiff objected. He was told to change into his work clothes. At 7:30 a.m., he and Ricky Simpson, the business agent for the union, and Diane Johnson, a union steward, went to the office of Keith Locke, personnel manager for the Company, to discuss the question of who was going to drive the automobile to Frankfort. At the meeting, the plaintiff claims that he was charged by Locke with refusing to go to Frankfort, and that plaintiff did not have a chance to present his side of the case because Locke was yelling. Plaintiff also contends that Simpson did not speak any words on his behalf. Plaintiff admits that he did point his finger in Simpson's direction during the discussion, and states that Simpson was hostile and said "Get out of my face."

Following the discussion which broke up at about 7:50 a.m., plaintiff proceeded to the locker room, changed back to his street clothes, and went to his automobile. While proceeding in his automobile to a point near the guard shack maintained by the Company, he noticed Simpson's automobile immediately behind him. Plaintiff claims that Simpson sounded his horn. Plaintiff thereupon got out of his automobile and walked back to the Simpson automobile where he claims that Simpson cursed him and hit him. Simpson, on the other hand, claimed that plaintiff hit him first with a sucker punch, and that as a result, Simpson's nose was fractured. Two independent witnesses, Roden and Mills, one of whom was driving a truck owned by the A–1 Sanitation Company, both maintain that the plaintiff struck Simpson first. In addition, Carolyn Smiley, who was the guard at the shack, testified that she saw plaintiff hit Simpson once, although she did not mention it in her original incident report where she merely said that there was a fight going on between the two.

Following the fight, during which plaintiff's shirt was torn, plaintiff returned to the plant. While there, he was in an agitated state of mind, and called Groover, with whom he met, a "punk." Consequently, Mr. Locke, the personnel manager of the Company, determined that plaintiff should leave the Company premises and go home, which plaintiff did in compliance with Locke's orders. Shortly after plaintiff left the plant, he was placed on suspension pending investigation.

On December 4, 1984, Lock called a meeting attended by plaintiff and by Diane Johnson and Joe Lynch, who were union stewards. During the course of that meeting, Diane Johnson, despite her inexperience as a union steward, addressed many questions to Mr. Locke and made several contentions on behalf of the plaintiff.

Three days after the December 4 meeting, plaintiff was notified that he had been discharged. On December 12, 1984, plaintiff, following a conference with his attorney Norman Belker, filed a grievance pertaining to both his suspension and discharge. On December 20, 1984, the grievance regarding the suspension was denied as untimely. The grievance regarding the termination was denied on its merits. At some time during the course of these events, it was agreed by the Union and by Mr. Locke that the Union would have an extension of time within which to decide whether to take the termination grievance to arbitration.

Following that agreement, Baker conducted a meeting attended by Locke, plaintiff, Diane Johnson and Joseph Lynch. In giving his version of the incident which occurred on November 30, plaintiff claimed as always that Simpson was the aggressor. He also claimed that he had never seen the Company rules of conduct placed on a bulletin board behind glass. Union members who were present went to the bulletin board, along with plaintiff, and there saw the Company rules posted. After the meeting on January 4, 1985, Baker, the president of the local union, advised plaintiff that the Union was not going to take plaintiff's suspension and termination to arbitration. The reasons for that determination were, according to the Union president, that he did not believe plaintiff's version of the events that took place on November 30, and that arbitrators always decide that a union employee who is the aggressor in a fight involving company employees is not entitled to be reinstated following discharge.

The primary issues raised by Baker and the local union at the January 4 meeting centered around the fact that plaintiff had been a good employee, and that he was entitled to mercy and to be reinstated because of his good record. No contention was made by Baker that the fight did not occur on Company property or that the rules of conduct did not apply to plaintiff's conduct. The Court observes that any such contention would probably have been of no avail since there was evidence that the fight occurred on Company property, and even if it did not, fighting between employees was a dischargeable offense.

Following the January 4 Third Step meeting, plaintiff and Simpson were both

invited to attend the January 15, 1985 executive meeting of the international union. There, plaintiff and Simpson appeared separately to present their versions of the fight. The versions that they gave on January 15 did not vary substantially from those given on January 4 and December 4. After the meeting, the Union did request an opinion from their Cincinnati attorneys as to whether plaintiff's grievance should be taken to arbitration; they received an opinion that it should not.

It is noteworthy that defendants have cited many arbitration decisions revolving around fights between employees, and there seems to be unanimity in the arbitrators' opinion that an aggressor in a fight between employees is not entitled to be reinstated to employment following discharge.

■ In construing Section 301 of the Labor Management Relations Act (29 U.S.C. Sec. 185), the courts have universally held that in order for the plaintiff to recover in a fair representation suit, he must show a breach of contract between himself and the company and a lack of fair representation by the union. In the instant case, plaintiff has not shown that there was a breach of contract by the Company. The rules of employee conduct provide that an employee may be discharged for engaging in a fight with a fellow employee on Company property or engaging in violent conduct against a fellow employee.

■ Looking next to the question of whether or not the Union fairly represented plaintiff in his dealings with the Company over his termination, the general rule is that the union must exercise good faith in processing its members' grievances. Proof of unfair representation by a union depends on a showing that a "union's conduct towards a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In *Ruzicka v. General Motors Corporation*, 523 F.2d 306, 309–310 (6th Cir.1975), the court held a union "must treat all factions and segments of its membership without hostility or discrimination

... Its broad discretion in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct."

In determining what is arbitrary conduct, the Sixth Circuit Court of Appeals in *Ruzicka* stated that "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," and where that occurs, the plaintiff has a cause of action as against both the union and the company.

While the plaintiff went to great lengths in his testimony to show that Simpson was hostile to him and took no steps at all to protect his rights in the November 30 meeting which preceded the fight, the crucial question is whether the Union, acting through John Baker, violated the duty of fair representation and acted in a perfunctory manner in declining to arbitrate plaintiff's termination grievance. The answer to that is negative, even though it might be contended that the Union could have put up some argument on the question of whether or not the fight occurred on Company property. We believe that the Union acted reasonably in light of the fact that plaintiff could summon no witnesses other than himself to back up his version of the fight, and in light of the testimony of the independent witnesses, as well as Simpson, that plaintiff was the aggressor.

We note that in the meeting held on December 4, Helen Herbst acted as the stenographer and recorded the statements of the plaintiff and others. Those statements made by the plaintiff, according to Ms. Herbst, are damaging to his version of the fight given on other occasions. He stated at that meeting that he was angry or upset and that he hit Simpson.

The Court has reviewed the case of *Griffin v. International Union, United Automobile, A. & A.I.W.*, 469 F.2d 181 (4th Cir.1972). There, Griffin was awarded a jury verdict of $12,000 in his suit for damages against the appellant union, arising out of its alleged breach of duty of fair representation in handling the grievance based on his discharge by the Ford Motor

Company. In that case, Griffin became embroiled in a fight at a local hockey game with management's second ranking member, D.J. Cashion. During that fight, Cashion sustained facial lacerations and cracked ribs. As a result of the incident, Griffin was discharged by Depot Manager Meares upon his return to work.

J.W. Brown, who was the Union Committee chairman, filed with Cashion a grievance seeking Griffin's reinstatement. Cashion refused. After Griffin was fined $50 by a local court for the assault, Brown recommended to his committee that Griffin's grievance be withdrawn. When one of the committee members objected, Brown threatened to resign. The grievance was then withdrawn.

Griffin then appealed to the membership of the Union to reverse the decision. The membership decided that Griffin's grievance would be pursued, whereupon Brown resigned his position as house chairman. The appeals committee of the international Union, however, upheld the action of the House Committee. Finally, Ford agreed to reinstate the grievance and allow it to be processed, and after two years, the grievance was denied by the Ford Umpire.

The Fourth Circuit Court of Appeals held that the union's insistence on filing the grievance with Cashion could not be justified and, therefore, breached the arbitration standard set out in *Vaca v. Sipes, supra.* The court also held that "there was evidence presented to the jury which might have found the Union's handling of the grievance to have been motivated by bad faith" in that Cashion had been a personal friend of Brown for many years, as well as a very good friend with one of the members of the committee and a close friend of a union member who testified against Griffin.

In the case at bar, there is no showing of close friendship between Mr. Locke and Mr. Baker, or between Mr. Locke and Mr. Simpson, even though it is recognized that these men dealt with each other on many occasions in representing the respective interests of their employers.

■ In the case of *Hellums v. Quaker Oats Co.,* 760 F.2d 202 (8th Cir.1985), three union employees participated in a fight with each other. Each was discharged. The Union brought grievances on the part of each and took them to arbitration. The appellate court, in commenting on the actions of the Union at the arbitration hearing, stated that the union "could have made its own credibility judgment as between Hellums and Keener on the one hand, and Griggs on the other.... and it would have been entitled to take a position favoring that party in the dispute," citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1237, n. 9 *en banc,* (8th Cir.1979), *cert. denied* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980).

The last two sentences of n. 9 on page 1238 contained in *Smith, supra,* state as follows:

> In the situation of a direct conflict between employees, a union's decision to support a particular position must be made in good faith and not arbitrarily. This would seem generally to require an informed, reasoned judgment regarding the merits of the claims.

Here, it appears that the Union made an informed judgment as to the merits of the conflicting claims between Simpson and Hayes. The fact that Simpson was the business agent of the Union, and Hayes was a non-official member with a low ranking in the heirarchy does not mean that the Union took the side of Simpson simply because of that fact. It does, however, impose upon this Court the duty to look very carefully at the fact situation in order to determine whether the Union breached its duty of fair representation. As stated above, we believe that the Union met that duty.

■ We overrule the plaintiff's contention that an unemployment commissioner's decision that plaintiff was not discharged for cause prevents the Company from litigating that matter in this Court. The Kentucky Supreme Court in the case of *Commission on Human Rights v. Lesco Manufacturing & Design Co., Inc.,* 736 S.W.2d 361 (1987), has held that the doctrine of

collateral estoppel is not applicable to bar a plaintiff from recovering on his civil rights claim where there had previously been an unappealed decision of the unemployment examiner. In order to have a collateral estoppel, the court said there would have to be a "judicial-type adversary proceeding, with testimony taken under oath, with witnesses being available for cross examination, and with a record of the proceedings, including any written and documentary evidence which was presented at the hearing." *Lesco, supra,* at 363. Here as in *Lesco,* there was only the plaintiff's complaint and Ralston Purina's response; there was no evidentiary hearing.

■ Plaintiff, in his pleadings, complains of an alleged conspiracy between the Company and the Union to deprive him of his rights. He also claims that the Company and the Union acted in gross disregard of his rights, and that their conduct constituted gross negligence for which he is entitled to punitive damages. Finally, he complains that the acts of the Union and the Company constituted an outrageous course of conduct intentionally designed to inflict emotional and mental pain and suffering.

We believe that all of these allegations are without merit in that plaintiff has failed to prove that there was collusion between the Union and the Company designed to deprive him of his rights as an employee. As stated before, the plaintiff committed a dischargeable offense, and the Union, in the exercise of its duties of fair representation, decided not to take the matter to arbitration.

■ With reference to the claim of outrageous conduct, it is obvious that plaintiff's allegations must fail. In *Craft v. Rice,* Ky., 671 S.W.2d 247 (1984), Kentucky adopted Section 46 of the Restatement of Torts (Second), which points out that the right to recover for the intentional infliction of emotional distress is a rather extraordinary one and must spring from conduct which is so extreme as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. Furthermore, even if conduct is extreme and out-

rageous, the actor is never liable where he has done no more than to insist upon his legal rights in a permissible way. See 46(g), Restatement of Torts (Second). Here, the conduct of the defendants was legally permissible, and certainly could not be considered to be of the type condemned by section 46.

■ The Union claims damages as a result of plaintiff's acts. It points out that Baker made several trips to Louisville to investigate plaintiff's grievance and/or to fulfill the duties normally performed by Simpson. On those occasions, secretary-treasurer Curtis performed Baker's duties. Also, there is a claim that Simpson was unable to work in March 1985 because of corrective surgery on his nose. The Union contends that its members were denied essential services and effective representation as a result.

The Union also claims that it expended $143 for Baker's expenses for a Louisville trip paid on December 4, 1984, and $70 paid on January 4, 1985. Baker also received $25 for a trip to Louisville on December 21, 1984. Also, the Union paid a temporary secretary $150 to staff the Louisville office for six days in March 1985 to fill in for Simpson during his absence.

The Union has not cited any authorities to bolster its argument. No doctor has testified that the surgery on Simpson's nose was due solely or in part to the fight of November 30, 1984. In the absence of such proof, it would seem that the evidence is insufficient to warrant a finding that the surgery came about as a proximate cause of the fight.

■ Insofar as Local 213 expended $238 for Baker's expenses, those expenses were incurred because Baker, as Union President, was investigating the claims of the plaintiff relative to the very serious matter of discharge. This was the duty of the Union as plaintiff's representative. The Court is of the opinion that a Union should not be in the position of assessing its members for asking it to process their grievance and taking the steps necessary to do so.

We have entered an order dismissing the plaintiff's complaint with prejudice.