**Allen L. GRIFFIN, Appellee,**

v.

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Appellant.**
**No. 72–1126.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 11, 1972.

Decided Oct. 24, 1972.

Bernard G. Link, Baltimore, Md. (Stephen I. Schlossberg, John A. Fillion, and Jordan Rossen, Detroit, Mich., on brief), for appellants.

Hugh G. Casey, Jr., Charlotte, N. C. (George S. Daly, Jr., and Casey & Daly, P. A., Charlotte, N. C., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and BUTZNER, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

Allen Griffin, the appellee, brought a civil action for damages against the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. He claimed that the UAW had breached its duty of fair representation in handling the grievance based on his discharge by the Ford Motor Company. The case was tried before Judge McMillan and a jury and resulted in a verdict in favor of Griffin in the amount of $12,000. From this judgment, the UAW appeals.

In its brief the appellant raised several issues which were not pursued at oral argument. After a careful examination of the record, the briefs of the parties and the pertinent authorities, we conclude that these contentions are without merit. The only issue deserving discussion is whether there was sufficient evidence to support the jury's finding that the Union breached its duty of fair representation.

I

The phrase "duty of fair representation" is a legal term of art, incapable of precise definition. St. Clair v. Local 515, Int'l Bhd. of Teamsters, etc., 422 F.2d 128, 130 (6 Cir. 1969). There is no code that explicitly prescribes the standards that govern unions in representing their members in processing grievances. Whether a union breached its duty of fair representation depends upon the facts of each case. Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191 (4 Cir. 1963); Trotter v. Amalgamated Ass'n of Street Railway Employees, 309 F.2d 584 (6 Cir. 1962), cert. den., 372 U.S. 943 (1963). But pronouncements made from time to time by the Supreme Court, articulating the somewhat hazy contours of the union's obligations, do furnish a measure of guidance.

The doctrine of the "duty of fair representation" was first given currency by the Supreme Court in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Although first propounded in the context of racial discrimination under the Railway Labor Act, the Court extended this duty to cases under Section 301 of the National Labor Relations Act. Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). In representing its members, declared the Court, a union is permitted "a wide range of reasonableness," but this latitude is "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* at 337–338, 73 S.Ct. at 686.

The outline of the duty of fair representation cognizable under Section 301 was further clarified in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). That case declared

that a union is accorded considerable discretion in the handling and settling of grievances. The individual employee has no absolute right to insist that his grievance be pressed through any particular stage of the contractual grievance procedure. A union may screen grievances and press only those that it concludes will justify the expense and time involved in terms of benefiting the membership at large. Encina v. Tony Lama Boot Co., 448 F.2d 1264 (5 Cir. 1971). In the *Vaca* decision itself, the Court held that a union did not necessarily breach its duty of fair representation when it refused to take a member's grievance to arbitration.

■ Nonetheless, the Supreme Court did not invest the union with a carte blanche. It sought to fashion an appropriate standard by which to measure union conduct. "[The doctrine of fair representation] includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, *supra,* 386 U.S. at 177, 87 S.Ct. at 910. A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

■ The repeated references in *Vaca* to "arbitrary" union conduct reflected a calculated broadening of the fair representation standard. Retana v. Apartment, Motel, Hotel & El. Op. U., Local 14, 453 F.2d 1018, 1023 n. 8 (9 Cir. 1972); Feller, "Vaca v. Sipes, One Year Later" in N.Y.U. Twenty-First Annual Conference on Labor 141, 167

(1969). While negligence in handling grievances has not been identified as breaching the union's duty of fair representation, Bazarte v. United Transportation Union, 429 F.2d 868, 872 (3 Cir. 1970), the courts have adopted the position that a union may not arbitrarily ignore a meritorious grievance or handle it in a perfunctory manner. Vaca v. Sipes, *supra* 386 U.S. at 191, 194, 87 S. Ct. 903; Retana v. Apartment, Motel, Hotel & El. Op. U., Local 14, *supra,* 453 F.2d at 1024 n. 10; De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 284 (1 Cir. 1970); St. Clair v. Local 515, Int'l Bhd. of Teamsters, etc., 422 F.2d 128, at 130. Without any hostile motive of discrimination and in complete good faith, a union may nevertheless pursue a course of action or inaction that is so unreasonable and arbitrary as to constitute a violation of the duty of fair representation. A union may refuse to process a grievance or handle the grievance in a particular manner for a multitude of reasons, but it may not do so without reason, merely at the whim of someone exercising union authority. A union must especially avoid capricious and arbitrary behavior in the handling of a grievance based on a discharge—the industrial equivalent of capital punishment.

■ For a successful suit against a union for breach of its duty of fair representation, the employee "must also have proved arbitrary *or* bad-faith conduct on the part of the union in processing his grievance." Vaca v. Sipes, *supra,* 386 U.S. at 193, 87 S.Ct. at 918 (emphasis added). We believe that looking at the evidence in the light most favorable to Griffin—as we are bound to do at this stage—there is sufficient evidence to support a conclusion of arbitrary or bad-faith conduct.

## II

For seven years Allen Griffin worked for the Ford Motor Company at its parts depot in Charlotte, North Carolina. His problems apparently began in July, 1965, when he was disciplined by the

Warehouse Operations Manager, D. J. Cashion, management's second ranking member at the forty men depot, for allegedly reading a newspaper that lined the handtruck used by Griffin in his work. Cashion's disciplinary action was successfully appealed by the Union. Subsequently, the relationship between the two men further deteriorated until they became embroiled in a fight[1] at a local hockey game, with Cashion sustaining facial lacerations and cracked ribs. As a result of these fisticuffs, Griffin was discharged by Depot Manager Meares upon his return to work. In addition, a local court fined Griffin $50 for the assault.

J. W. Brown, who worked immediately under Cashion, was the chairman of the Union's Local House Committee. His responsibilities included handling the preliminary stages of the grievance procedure. He filed with Cashion, the very man with whom Griffin had the fight, the grievance seeking Griffin's reinstatement. Not surprisingly, Cashion, representing Ford, refused reinstatement. After Griffin's assault conviction, Brown recommended to his fellow committee members that Griffin's grievance be withdrawn. When one of the committee members objected, Brown threatened to resign. The grievance was withdrawn by a 2–1 vote.

Griffin then appealed to the membership of his Local to reverse the decision to withdraw his grievance. A vote was taken and it was decided that Griffin's grievance be pursued. In protest of the members' action, House Committee Chairman Brown resigned his position as House Chairman. But the action of the House Committee in withdrawing Griffin's grievance was upheld by an appeals committee of the International; although the committee recommended that efforts to secure Griffin's rein-

statement continue. Finally, Ford agreed to reinstate Griffin's grievance and allow it to be processed through normal channels on the condition that Griffin waive any claim for back pay prior to the time the grievance was reinstated. Griffin accepted this proposal. The revived grievance, "frozen dead"[2] after the two-year hiatus, was eventually heard by the Ford Umpire, who on March 22, 1968, upheld the discharge.

### III

The Union's insistence on filing the discharge grievance with Cashion, the man with whom Griffin had fought, cannot be justified. It represents a stubborn refusal to recognize the inequity of placing the matter in the hands of a hostile person—Griffin's antagonist. Although the Union may have acted in good faith, grieving the discharge in this manner can be viewed—as the jury apparently viewed it—as the equivalent of arbitrarily ignoring the grievance or handling it in a perfunctory manner. Vaca v. Sipes, *supra*, 386 U.S. at 191, 194, 87 S.Ct. 903. The "arbitrary" standard elucidated in *Vaca* was thus breached.

The Union attempts to justify submitting the grievance to Cashion by pointing out that the only other person with whom the grievance could have been filed was Meares, the Depot Manager. This, the UAW maintains, "was at best a Hobson's choice: Cashion, the man Griffin assaulted on the one hand, and Meares, the man who discharged Griffin, the very act that was being protested, on the other hand."[3]

The Union's contention overstates the case. Cashion had a history of difficulties in supervising the men under him. There was evidence that he was "very high tempered" and that he was willing to use his position of authority to pun-

---

1. Earlier in the summer, the two men almost became involved in a fight when Cashion invited Griffin outside the plant behind the railroad tracks to settle their difference and to "whip his blank"—an invitation declined by Griffin.

2. This characterization was given the reinstated grievance by Judge McMillan. (Tr. 403.)

3. Appellant's Reply Brief at 2–3.

ish those "who crossed him." Meares, at the time of the discharge, had heard only Cashion's version of the fight and the incidents that led up to it. It is quite possible that if the grievance had been immediately filed with Meares and Cashion's history of pugnacity with workers in general, and his goading of Griffin in particular, had been adequately presented, Meares would have mitigated his disciplinary action. The fact that Meares refused the grievance after it was reinstated nearly one and one-half years later has no relevance. The passage of time and the hardening of positions had taken their effect.

There was also evidence presented to the jury from which it might have found the Union's handling of the grievance to have been motivated by bad faith. After the membership of the Local voted to pursue Griffin's grievance, House Committee Chairman J. W. Brown resigned his position to protest the members' action. He was replaced by George R. Kennedy. On April 8, 1966, Kennedy wrote Walter P. Reuther, the late president of the UAW, to express his opinion that the action of the Local in dropping Griffin's grievance was the result of the friendship between Cashion and J. W. Brown. In the course of the letter Kennedy stated poignantly:

> Mr. Cashion, having been a personal friend of the former Chairman [Brown] for many years, as well as a very good friend with one of the committeemen and a close friend of the union member who testified against Mr. Griffin, used these friendships to influence the committee's decision to drop the case as far as the committee was concerned. Therefore, when the membership overruled the committee, the Chairman, Mr. J. W. Brown resigned.
>
> *In my opinion those officers who were in a position to help Mr. Griffin, were trying to find as many reasons as they could not to help him.* This is illustrated by the very fact that I am writing this letter because Mr. T. C.

Brown, our Recording Secretary, and the brother of Mr. J. W. Brown, the resigned Chairman, refused to answer your letter of March 30, 1966. (Emphasis added.)

There is sufficient evidence in the record to support the jury's finding that the Union breached its duty of fair representation in handling Griffin's discharge grievance. Therefore, the judgment of the District Court is hereby

Affirmed.