[No. 8671–5–I.   Division One.   May 24, 1982.]

PHILLIP CHARLES ALLEN, ET AL, *Appellants,* v. SEATTLE POLICE OFFICERS' GUILD, ET AL, *Respondents.*

*Houghton, Cluck, Coughlin & Riley* and *Phillip Gins-berg,* for appellants.

*Clinton, Fleck, Glein & Brown* and *Lawrence B. Linville,* for respondents.

DURHAM, A.C.J.—Phillip Charles Allen and 25 other black police officers appeal a judgment that the Seattle Police Officers' Guild met its duty to fairly represent their interests.

The Seattle Police Officers' Guild is certified under state law as the exclusive bargaining representative of all sworn police officers of the Seattle Police Department (Department) up to and including the rank of sergeant. The Guild negotiates collective bargaining agreements with the City of Seattle (City) relative to wages, hours and conditions of employment. Phillip Charles Allen and all other plaintiffs are present or former black Seattle police officers who are

or have been employed since 1969 in the collective bargaining unit represented by the Guild. All individually named defendants are present or former officers or directors of the Guild who have held office on or after 1969. For convenience, the plaintiffs are referred to collectively as the black officers and the defendants are referred to as the Guild.

The black officers allege that since 1969 the Guild has breached its duty to fairly represent their interests, and has acted arbitrarily, in bad faith, and with hostility or discrimination toward them. The black officers' allegations of unfair representation fall into two broad categories: the Guild's pursuit or support of litigation challenging the City's affirmative action program, and the Guild's failure to adequately assist or support its black members in other matters.[1]

> *Guild litigation over City's affirmative action program.*

Hiring and promotion to positions within the Department are determined by a civil service competitive examination which yields a certified list of eligible candidates (eligibles) who are ranked according to their examination scores. The Guild's contracts with the City have provided that hiring and promotion vacancies are to be filled from among the top five eligibles or the top 25 percent of the total available eligibles on the register. Guild contracts with the City have also provided that the City shall maintain high standards for the police officer entrance exam, and that the City shall not reduce the standards below those of the 1965 entrance examination without first notifying the Guild.

The Guild's contracts with the City have contained a "retention of benefits" clause, which is meant to maintain all past practices and benefits from contract to contract,

---

[1]The parties stipulated that the black officers' claims were not brought under Title VII of the 1964 Civil Rights Act or RCW 49.60, Washington's Law Against Discrimination.

unless specifically deleted or modified by new contracts negotiated between the Guild and the City. Past and current contracts have provided that the City must notify the Guild of any significant departmental changes in working conditions, and enter into good faith conferences with the Guild before implementing such changes. Finally, past and current contracts have provided that neither the Guild nor the City shall discriminate against any employee by reason of race or sex.

For 20 years prior to August 2, 1976, the consistent practice of the City was to hire or promote in order of rank on the eligibility registers. The Guild's position is that this procedure is a "past practice" or "benefit" within the meaning of past and present Guild contracts. Since the beginning of 1976, the City of Seattle has had an affirmative action program which provides that hiring and promotion to positions in the Department must be filled on a quota basis; *i.e.,* for each white male hired or promoted to a position within the Department, one woman applicant and one minority applicant must be next hired or promoted.

Selective certification is a hiring or promotional procedure whereby the Department may request the City to certify a list of qualified eligibles for a vacant position, when such eligibles possess special qualifications or belong to an underrepresented group. Guild contracts with the City have never provided for selective certification of minority or women officers, except when the certification is based on requirements for special experience or skill.

On August 2, 1976, the City promoted a black police officer, Ed Joiner, to the position of sergeant. Officer Joiner's promotion was "out of order" because there were higher scoring and higher ranked eligibles on the certified eligibility list who were not promoted. Joiner's promotion was made pursuant to selective certification procedures which are allegedly contrary to the provisions of the Guild's contracts with the City.

On December 19, 1978, the City promoted a black police officer, Duane Coverson, to the position of police sergeant.

This was the first time that an officer was promoted out of order from below the top 25 percent of ranked eligibles on a certified eligibility list pursuant to the City's affirmative action program.

In the past, the Guild has opposed all out–of–order promotions of white male police officers for any reason other than special expertise or qualifications. The Guild has also denied the request for assistance from white male officers who have sought the Guild's assistance in being promoted out of order for any reason other than special expertise or qualifications. Thus, since 1969, the Guild has opposed out–of–order *hiring or promotion, regardless of race or sex.*

Between August 2, 1976 and April 22, 1977, the Guild obtained legal advice on several occasions and pursued administrative remedies with various agencies in its opposition to out–of–order hirings or promotions. On April 22, 1977, as a result of the promotion of Officer Joiner, the Guild filed suit in federal court to challenge the legality of the City's affirmative action program insofar as it afforded quota preferences to minority and women eligibles. The suit initiated by the Guild was based in part upon alleged violations of the City's contracts with the Guild, and included a prayer for damages on behalf of the officers who were not timely promoted due to the City's alleged reverse discrimination. That action was pending at the time of trial.

In May 1978, the Guild filed an action in King County Superior Court to enjoin the mayor from implementing the City's affirmative action plan within the Department on the ground that the attempt would violate the contract between the City and the Guild. The Guild was unsuccessful in the suit.

In July 1978, the Guild financed a second federal lawsuit against the City on behalf of James D. Brownell, a white male applicant seeking employment with the Department. Brownell claimed that the City wrongfully discriminated against him because of his race and sex. In December 1978, as part of its initial lawsuit in federal court, the Guild

sought an injunction to remove Duane Coverson from the rank of sergeant. In 1977, the Guild had spent $400 to finance an amicus curiae brief on behalf of the Seattle fire fighters, who were apparently challenging the City's non-competitive examination.

By the time of trial, the Guild had spent $35,332.32 on challenges to various aspects of the City's affirmative action program.

*Guild assistance to or representation of its black members.*

Since 1969, numerous Guild members, both black and white, have sought Guild assistance, including assistance in obtaining legal representation. The black officers point to certain incidents in support of their contention that the Guild acted arbitrarily, discriminatorily, and in bad faith toward its black members.

In 1969, Sergeant Milton Price, a black police sergeant, requested that the Guild reimburse him for attorney's fees he had incurred in challenging the Department's allegedly arbitrary or wrongful refusal to promote him to the position of lieutenant. Price brought suit against the City, prevailed, and was appointed lieutenant. Price learned that the Guild was financing a legal challenge to the Civil Service Commission order that had resulted in the ineligibility of two white sergeants seeking the same position. The Guild board refused to reimburse Price for attorney's fees he had already incurred because, according to a long–standing Guild policy, a Guild member must first request the Guild to use the Guild attorney before any legal expenses have been incurred. Price sued for wrongful failure to pay his attorney's fees and prevailed. The trial court in that action found that because the Guild had not refused to give financial support to the other two officers, it could not refuse to give financial assistance to Price in the same matter: "To refuse to extend such financial assistance would constitute discriminatory and unequal treatment."

In 1976, Berry Carter, a black police officer, requested

use of the Guild attorney because he had been dismissed from the Department. Carter's request for use of the Guild attorney was denied because a majority of the board believed that Carter's dismissal by the Department was warranted under the circumstances. In 1978, Carter asked the Guild to pay for attorney's fees incurred as a result of his successful challenge to his dismissal by the Department. The Guild board considered Carter's request and decided that, as a matter of policy, it should provide some legal assistance to members facing dismissal from the Department. The board voted to make its policy retroactive to Carter's 1976 request for use of the Guild attorney, and Carter's attorney's fees were paid up to and including the civil service hearing.

Between 1975 and 1979, several other black officers requested and received Guild assistance, including legal representation.

The black officers filed the instant lawsuit in July 1978, seeking relief in the form of damages, an accounting and restitution for expenditure of Guild funds for the undertaking of activities designed to benefit only white male members, and an order restraining the Guild from using Guild funds for such activities. After a bench trial, the court found that the Guild had met its duty of fair representation to its black members.

The black officers assign error to this conclusion. In addition, the black officers assign error to the entry of several findings of fact and to the trial court's refusal to enter several other findings. Finally, the black officers contend that the trial court's concern about interfering in the litigation in federal court hindered its evaluation of the evidence.

■ The principal issue on appeal is whether or not the Guild breached its duty of fair representation to its black members.[2] The duty of fair representation was first enunci-

---

[2]The Guild's duty of fair representation is an adjunct to its authority as exclusive bargaining representative for all officers up to and including the rank of sergeant. The Guild derives this authority from RCW 41.56.080. RCW 41.56.080 is

ated in *Steele v. Louisville & N. R.R.*, 323 U.S. 192, 89 L. Ed. 173, 65 S. Ct. 226 (1944). The Supreme Court held that the Railway Labor Act imposed upon the exclusive bargaining representative of a class of employees "the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." *Steele,* at 203. The duty of fair representation was extended to unions certified under the National Labor Relations Act. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 97 L. Ed. 1048, 73 S. Ct. 681 (1953). The duty of fair representation has been defined as

> a judicially conceived obligation placed upon statutorily created exclusive bargaining representatives to protect the rights of individual employees from possible excesses of majority rule.

Flynn & Higgins, *Fair Representation: A Survey of the Contemporary Framework and a Proposed Change in the Duty Owed to the Employee,* 8 Suffolk U. L. Rev. 1096, 1101 (1973–74). A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or demonstrates bad faith. *Vaca v. Sipes,* 386 U.S. 171, 190, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967).

    Necessarily included within the question of fair representation is the scope of that duty. That is, does the duty of fair representation, as used herein, extend to the facts and circumstances forming the basis of this particular cause of action? Unfortunately, this area of the law is still in a state of flux. As the court in *Griffin v. UAW,* 469 F.2d 181, 182 (4th Cir. 1972) noted:

> The phrase "duty of fair representation" is a legal term of art, incapable of precise definition. . . . There is no

---

similar to the National Labor Relations Act § 9(a), 29 U.S.C. § 159(a) (1973). In construing state labor acts which are similar to federal labor legislation, decisions under federal labor law, while not controlling, are persuasive. *See State ex rel. Washington Fed'n of State Employees v. Board of Trustees,* 93 Wn.2d 60, 68, 605 P.2d 1252 (1980). Therefore, we look to federal cases and commentary on those cases to clarify the issues before us.

code that explicitly prescribes the standards that govern unions in representing their members in processing grievances. Whether a union breached its duty of fair representation depends upon the facts of each case. *See* Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex. L. Rev. 1119, 1121 (1973). One commentator has characterized the union's obligation by noting:

> While the duty of fair representation is thus quite comprehensive, there are certain limits to the union's accountability. Most clearly, since the duty is derived from the union's power as exclusive representative in bargaining and grievance–processing, it is only in those activities that the duty of fair representation applies.

R. Gorman, *Labor Law* 706 (1976). In a similar vein, the court in *Black Musicians v. Local 60–471, Am. Fed'n of Musicians,* 375 F. Supp. 902, 910 (W.D. Pa. 1974), *aff'd,* 544 F.2d 512 (3d Cir. 1976) stated:

> Plaintiffs apparently read *Vaca* and related cases to say that the duty of fair representation extends to any action a union takes toward its members which the members consider to be in derrogation of their rights. We do not think the duty is that broad. The duty does not reach into and control all aspects of the union's relationship with its members. The duty extends only to negotiating, administering or enforcing a collective bargaining agreement.

*But see Retana v. Apartment, Motel, Hotel & Elevator Operators Local 14,* 453 F.2d 1018, 1024 (9th Cir. 1972) (intraunion conduct cannot be wholly excluded from the duty of fair representation).

The gravamen of the black officers' complaint is that the Guild has used Guild funds, including dues contributed by black members, to finance litigation challenging some of the City's affirmative action measures. In addition, the officers claim that the Guild has discriminated in its provision of Guild assistance, particularly the use of the Guild attorney.

While these allegations seriously question internal union practices, it is difficult to see how they relate to the negotiation or administration of the collective bargaining

agreement.[3] Thus, it does not appear that the scope of the duty of fair representation encompasses the facts of this case. Further discussion of this question is unnecessary, however, because we conclude that even if the duty of fair representation applies here, we find no breach of that duty.

The black officers' claims that the Guild breached its duty of fair representation fall into two categories: (1) arbitrariness and bad faith, and (2) discrimination. We shall consider these in order.

### BAD FAITH AND ARBITRARINESS

The black officers argue that the Guild's decision to pursue the litigation challenging out-of-order promotions, despite the protests of black members, was made arbitrarily and in bad faith. The black officers argue that a union breaches its duty of fair representation if it supports one group of employees at the expense of another. Furthermore, when differences between competing groups arise, a union must try to accommodate those differences.

We disagree. The record does not support the interpretation that the decision to employ the Guild attorney in litigation against the City, despite the objection of black members, was made in bad faith. As the courts have repeatedly noted, it is a fact of union life that there will be conflicts of interest between groups of union members. In *Humphrey v. Moore,* 375 U.S. 335, 11 L. Ed. 2d 370, 84 S. Ct. 363 (1964), the court refused to find a breach of the duty of fair representation when a union had, in good faith, supported the position of one group of its members against another. The court stated:

---

[3]The black officers point to one Guild decision which clearly relates only to intraunion affairs in support of their contention that the Guild acted in bad faith. A Guild bylaw allows the Guild board in its discretion to revoke the authority to use the Guild attorney in a dispute in which two members have a conflict of interest. The black officers contend that the genesis of the bylaw, as well as a conflict of interest between black and white members, indicates that the decision to employ the Guild attorney in the litigation against the City was made in bad faith. In these circumstances, the Guild's application of its own bylaws is clearly an internal matter.

Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

*Humphrey,* at 349–50. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 97 L. Ed. 1048, 73 S. Ct. 681 (1953). The union's choice to represent the interests of the majority despite protests of the minority is not, ipso facto, evidence of bad faith.

Similarly, the decision to finance the litigation against the City was not arbitrary; it was neither unreasoned nor irrational. The record supports the conclusion that the Guild decided to pursue litigation against the City in federal court for nonhostile, nondiscriminatory reasons. In all past instances involving white male police officers who received out–of–order promotions or who sought to be promoted from out of their order on a certified eligibility list for any reason other than special expertise or qualifications, the Guild has opposed such promotions. The trial court found that the Guild opposed the out–of–order promotions of Officers Joiner and Coverson as violations of the Guild contracts with the City and Title VII of the 1964 Civil Rights Act. The Guild's challenge to out–of–order promotions is, thus, justifiable as the product of a consideration of relevant factors, particularly provisions of the Guild's contract with the City.

### DISCRIMINATION

The black officers contend that the Guild practiced discrimination in several ways. First they argue that the Guild's opposition to out–of–order promotions was improperly motivated; that is, the product of hostility or racial discrimination.

We disagree. A recent case from the Ninth Circuit pro-

vides guidance. In *Golden v. Local 55, Int'l Ass'n of Firefighters,* 633 F.2d 817 (9th Cir. 1980), the Oakland Black Firefighters Association alleged a breach of the union's duty of fair representation under state and federal statutes. Hull, a black probationary fire fighter, was discharged. Hull and the Black Firefighters Association brought suit, alleging that Hull had been discharged because of racial discrimination. The union voted to hire an attorney to represent the defendant fire chief and spent $30,000 collected from union dues in defense costs. The union also petitioned for a writ of mandamus to set aside a promotion list, arguing that plaintiff and two other firemen had been illegally placed on the eligibility list.

The Black Firefighters Association argued that the union's payment of costs in defending the fire chief and in challenging the eligibility list was discriminatory; *i.e.,* in order to fairly represent its members, the union should not have financed the fire chief's defense without providing similar sums to the minority plaintiffs. The Court of Appeals concluded that there was substantial evidence from which the trial court could find that the union's reasons for supporting the defense of the fire chief were valid and not a subterfuge for racial discrimination.

Similarly, there is substantial evidence that the Guild's reasons for challenging out–of–order promotions were valid and not a subterfuge for racial discrimination. As previously noted, the Guild has opposed out–of–order promotions or hiring, regardless of the race or sex of the candidate, since 1969. Several former and current Guild officers testified that the decision to pursue the litigation against the City was motivated not by racial animus, but by the belief that some of the City's affirmative action efforts violated the Guild contract with the City.

Neither does the record support the conclusion that the Guild's decision to finance the litigation against the City was part of a discriminatory course of conduct. Although Milton Price prevailed in his suit against the Guild for wrongful failure to pay his attorney's fees, the trial court in

the instant case found that "[t]he evidence does not prepond[e]rate that Race was a factor" in the Guild's failure to pay those fees. Also, in an unchallenged finding of fact, the trial court found that race was not a factor in the Guild board's initial decision to deny Berry Carter the use of the Guild attorney to challenge his dismissal from the Department. Finally, several black officers have requested and received assistance and support, including representation by the Guild attorney.

The black officers further contend that the Guild has discriminated against them by failing to take any action to alleviate underrepresentation of minorities within the Department while spending Guild funds to challenge the City's practice of out–of–order promotions and selective certification. The record below does not support this conclusion. First, we note that the Guild made some effort to rectify the underrepresentation of minorities within the Department. For example, the trial court found that the Guild had met with City officials for the purpose of encouraging the accelerated recruitment of qualified minorities, and had appointed an affirmative action committee which included several of the plaintiffs. The Guild's opposition to certain measures designed to alleviate underrepresentation of minorities within the Department cannot be automatically equated with racial discrimination, especially in view of a plausible argument that out–of–order promotions and selective certification violate the Guild contract with the City. Finally, the duty of fair representation does not impose upon the Guild the obligation to spend equal amounts of money for all interest groups. *See Golden v. Local 55, Int'l Ass'n of Firefighters, supra* at 821.

In sum, the black officers did not sustain their burden of proof in showing that the Guild's conduct was arbitrary, in bad faith, or discriminatory.

## Remaining Issues

■ The black officers challenge 17 findings of fact as unsupported by substantial evidence. We have carefully reviewed the challenges to the findings entered by the trial court. In most instances, the findings are supported by substantial evidence. An appellate court will sustain findings of fact which are supported by substantial evidence. *Bell v. Hegewald*, 95 Wn.2d 686, 628 P.2d 1305 (1981). In those few instances in which a finding is not supported by substantial evidence, there is no argument as to prejudice requiring reversal, nor can we independently discern such prejudice.

■ In addition, the black officers contend that the trial court erred in rejecting 24 proposed findings of fact. However, because there is substantial evidence to support the trial court's findings of fact which address the material issues in the case, we find no error in the trial court's refusal to enter the proposed findings. *See Agranoff v. Jay*, 9 Wn. App. 429, 431, 512 P.2d 1132 (1973).

The black officers also contend that comments by the trial court, particularly in a discussion of proposed findings of fact, indicate that the trial court's decision was motivated more by reluctance to interfere in the litigation in federal court than by evidence presented in the instant case. We disagree. The trial court's entry of 16 pages of findings and conclusions relative to the Guild's alleged breach of the duty of fair representation indicates that it decided the case on its merits.

■ Finally, the Guild contends that it should be awarded terms in the form of attorney's fees because this is a frivolous appeal. In determining if an appeal is frivolous and brought for the purposes of delay, we are guided by the following considerations:

(1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are

rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal.

*Streater v. White,* 26 Wn. App. 430, 435, 613 P.2d 187 (1980). We decline to award attorney's fees. In particular, we note that the scope and application of the duty of fair representation is a debatable issue and apparently an issue of first impression in our state courts.

The judgment of the trial court is affirmed and terms in the form of attorney's fees are denied.

SWANSON and CORBETT, JJ., concur.

Reconsideration denied June 29, 1982.

Review granted by Supreme Court October 22, 1982.