[No. 48925-4. En Banc. October 6, 1983.]

PHILLIP CHARLES ALLEN, ET AL, *Petitioners*, v. SEATTLE POLICE OFFICERS' GUILD, ET AL, *Respondents*.

---

*Houghton, Cluck, Coughlin & Riley, Phillip H. Ginsberg,* and *John W. Riley,* for petitioners.

*Clinton, Fleck, Glein & Linville,* by *Lawrence B. Linville,* for respondents.

*Lembhard G. Howell* and *Gwendolyn Howard* on behalf of Loren Miller Bar Association, amici curiae for petitioners.

ROSELLINI, J.—This case presents the issue of whether a union's financing of a legal challenge to the employer's affirmative action program violates the union's duty to represent fairly all of its members. The trial court held that petitioners had failed to establish a breach of the union's duty of fair representation. The Court of Appeals affirmed. *Allen v. Seattle Police Officers' Guild,* 32 Wn. App. 56, 645 P.2d 1113 (1982). We affirm.

I

Respondent Seattle Police Officers' Guild is a nonprofit corporation and labor organization which has been certified under the provisions of RCW 41.56.080 as the exclusive bargaining representative of all sworn police officers of the Seattle Police Department. The remaining respondents are

present or former officers or directors of the Guild.

The plaintiffs/petitioners are 26 black Seattle police officers who are or have been members in good standing of the Guild. The Guild has had a series of collective bargaining agreements with the City of Seattle which contained, *inter alia*, (1) a union shop clause (article 2), (2) a provision which requires hiring and promotional vacancies be filled from the top 25 percent of the total available eligibles (article 4, section 2), and (3) a clause which retains all past and current benefits (article 16).

Respondents urge, and the trial court found, that prior to 1976 the City had a "practice" of hiring or promoting from the eligibility list in rank order. The City's departure from the policy, in favor of an affirmative action program, brought about the controversy which sparked this lawsuit. The need for affirmative action programs is evident from the following statistics.

In 1969 the City of Seattle had only 6 black police officers out of a total force of over 1,000. In 1975 the number had grown to 23 officers with one in a supervisory capacity. By 1978 the number had changed from 23 to 27. Of these 27, 4 held supervisory positions and 2 held the rank of detective. Thus, at all times pertinent to this lawsuit, black police officers represented less than 3 percent of the total force, while the city of Seattle had a black population of approximately 13 percent.

In 1976 the City developed a plan to increase minority representation. The City's program provided that when a white male was hired or promoted by the Department, the next person hired or promoted would be either a female or of a racial minority. This selection process resulted in women and minorities being hired or promoted out of rank order. *All* hirees and promotees, however, were to be selected from the list of those who were certified, through testing, for the position.

The first promotion made under this plan was that of Officer Ed Joiner, who was promoted to the rank of police sergeant on August 2, 1976. Joiner's name was within the

top 25 percent of those eligible for promotion. He was not at the top of the list, however. Subsequent to Joiner's promotion, the Guild protested to City officials that his promotion was out of rank order. The Guild viewed the out of rank order promotion as a breach of the collective bargaining agreement. It filed, therefore, a complaint with the Public Employment Relations Commission (PERC). This complaint was dismissed, as were others filed with the Washington State Human Rights Commission, the Equal Employment Opportunity Commission and the Seattle Civil Service Commission. On April 22, 1977, the Guild and several individual police officers filed a suit in federal court challenging the City's use of quotas. This litigation was financed entirely through the use of Guild funds. In May of 1978, the Guild filed an action in King County Superior Court seeking to enjoin the City's implementation of its affirmative action program. This action was dismissed.

In June 1978, the Guild financed a second federal lawsuit on behalf of James C. Brownell. Brownell, a white applicant, was not a member of the Guild. In December of that year the City again promoted a black, Dwain T. Coverson, out of rank order. Unlike Joiner, he was not within the top 25 percent of those on the eligibility list. Shortly after Coverson's promotion, the Guild moved for an injunction in the federal action, seeking his demotion. By the time of trial, the Guild had spent $35,332.32 on challenges to the affirmative action program.

Petitioners brought suit against the Guild, alleging that it had engaged in conduct which breached the Guild's duty to represent the interests of all of its members. Petitioners base their action on the Guild's financing of the lawsuits challenging the quotas and on allegations of disparate treatment of black officers. This latter allegation deals primarily with the union's policy of providing legal assistance to its members in certain limited circumstances. Specifically, the petitioners point to two incidents where black police officers were denied legal funds.

The first occurred in 1969. Milton Price, a black police

sergeant, was passed over for promotion to lieutenant. Price brought suit against the City and prevailed. He subsequently learned the Guild was financing a legal challenge brought by two white sergeants seeking the same position. Price applied for payment of his fees, was refused and sued to recover them. He was successful and the fees were paid.

In 1976, a second incident occurred in which a black police officer was denied fees. In this case, the officer was accused of theft. The officer's request was denied, apparently because the majority of the Guild board members believed that he was guilty. He successfully challenged his dismissal and the Guild eventually reimbursed him for his legal expenses.

The final incident which forms the basis of this claim is the Guild's authorization of $400 for an amicus brief in the case of *Maehren v. Seattle,* 92 Wn.2d 480, 599 P.2d 1255 (1979), *cert. denied,* 452 U.S. 938 (1981). *Maehren* involved a challenge by the uniformed personnel of the Seattle Fire Department to a hiring system imposed upon them by the City. This court unanimously affirmed the trial court's holding that Title 7 of the Civil Rights Act of 1964 and equal protection guaranties did not prohibit such systems.[1]

At trial, the judge found that the Guild's actions did not constitute a breach of its duty of fair representation. The Court of Appeals affirmed and we accepted review. We affirm for the reasons set out below.

## II

This case presents issues of first impression in this state concerning the existence, scope and application of a union's duty to represent fairly its members. A brief history is needed before discussing its application to the facts of this case.

---

[1]The issue in *Maehren* was so closely related to the Guild's contentions in the federal lawsuits that it is likely that the brief was filed only to strengthen its position in that action by getting a favorable determination at the state level on the same issue. Thus, we will treat this incident as part of the Guild's decision to finance the legal challenge to the affirmative action program.

The duty of fair representation evolved as a judicial response to the broad power granted to unions as exclusive representatives of their members. The National Labor Relations Act § 9, 29 U.S.C. § 159(a) (1976) (Act of July 5, 1935, Pub. L. No. 74–198, 49 Stat. 449, as amended) grants this exclusivity. It provides:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit . . . shall be the exclusive representatives of *all* the employees in such unit . . .

(Italics ours.) The Railway Labor Act, 45 U.S.C. § 152 (1976), contains a similar provision as does RCW 41.56.080. The power inherent in this concept of exclusivity resulted in occasional abuses by unions who acted on behalf of the majority of employees to the detriment of those in the minority. Not infrequently early unions, divided on the basis of race, would seek to advance the interests of the whites through the bargaining process. The Court first addressed the problem in *Steele v. Louisville & N. R.R.*, 323 U.S. 192, 89 L. Ed. 173, 65 S. Ct. 226 (1944). In *Steele,* the railway company and the union negotiated a series of contracts which restricted the number of blacks which would be employed and relegated those already employed to the less desirable jobs. The Court, looking to the Railway Labor Act, first recognized that it bestowed substantial power upon the union to act on behalf of the employees, while it simultaneously curtailed the ability of minority members of the craft or unit to select alternative representatives. The Court then observed:

> "The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. . . .
>
> . . .
> . . . While the majority of the craft chooses the bargaining representative, when chosen it represents, as the Act by its terms makes plain, the craft or class, and not the majority. The fair interpretation of the statutory

language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents.

*Steele,* at 200–02. The Court went on to note that the duty arises from the grant of power in the union's favor.

Having recognized the duty, the Court did not define it but rather suggested some broad parameters. For instance, the doctrine would not prevent the union from making some contracts which might have unfavorable effects on some members. The Court noted:

Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit. . . . Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations.

*Steele,* at 203.

In a case handed down the same day, the Court implicitly applied the doctrine to unions certified under the provisions of the NLRA. *See Wallace Corp. v. NLRB,* 323 U.S. 248, 89 L. Ed. 216, 65 S. Ct. 238 (1944).

*Ford Motor Co. v. Huffman,* 345 U.S. 330, 97 L. Ed. 1048, 73 S. Ct. 681 (1953) represents the next major development in the doctrine. In *Huffman,* the union negotiated a contract provision which granted seniority credit to World War II veterans who had not worked for the employer prior to the war. Several employees, who were disadvantaged by this arrangement, challenged the provision. They argued that the union had violated its duty to represent fairly all its members by agreeing to the seniority credit. Rejecting this argument, the Court observed that

[t]he bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests

of all whom it represents. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, *subject always to complete good faith and honesty of purpose in the exercise of its discretion.*

(Italics ours.) *Huffman,* at 338.

The Court also focused on the important role such contract provisions played in reintegrating returning veterans and noted:

Nothing in the National Labor Relations Act, as amended, so limits the vision and action of a bargaining representative that it must disregard public policy and national security.

*Huffman,* at 342.

Starting with its decision in *Humphrey v. Moore,* 375 U.S. 335, 11 L. Ed. 2d 370, 84 S. Ct. 363 (1964), the Court progressed from broad general statements about the duty to a series of cases which attempted to characterize the type of union conduct which would constitute a breach of the duty. In *Humphrey,* the Court, using language from *Huffman,* phrased its inquiry as whether the decision to support one seniority plan over the other was made "honestly, in good faith and without hostility or arbitrary discrimination." *Humphrey,* at 350.

In *Vaca v. Sipes,* 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967), the doctrine was applied to a union's failure to process a grievance fully through the procedures specified by the collective bargaining agreement. The Court held that the National Labor Relations Board did not have exclusive jurisdiction over such actions. The Court stated that the doctrine was judicially developed and served unique interests not likely to be served by granting the Board exclusive jurisdiction. It then went on to comment:

The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit. This Court recognized in *Steele [v. Louisville & N. R.R.,* 323 U.S. 192 (1944)] that the congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination. Since that landmark decision, the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.

(Citations omitted.) *Vaca,* at 182.

Moving to the merits of the case, the Court examined the evidence introduced at trial and concluded that the jury had been allowed to determine the existence of a breach solely on evidence that related to the validity of the plaintiff's grievance. The Court held that it was improper to limit the issue to the validity of the grievant's complaint, since no individual had "an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca,* at 191. Instead, "he [the plaintiff] must also have proved arbitrary or bad–faith conduct on the part of the Union in processing his grievance." *Vaca,* at 193.

Subsequent cases have muddied this standard by suggesting that a duty of fair representation claim would lie only if there was "'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 29 L. Ed. 2d 473, 91 S. Ct. 1909, *reh'g denied,* 404 U.S. 874 (1971) (quoting *Humphrey v. Moore, supra* at 348). Language such as this, offered as it was in passing on a preemption issue, has left lower federal courts in somewhat of a quandary as to whether bad faith is an essential element of every duty of fair representation claim. *See* Clark, *The Duty of Fair Representation: A Theoretical*

*Structure,* 51 Tex. L. Rev. 1119, 1126 (1973). Good arguments have been advanced for the proposition that *Lockridge* does not require that bad faith be established in each case. *See* Clark, *supra.* Indeed, in the subsequent case of *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 47 L. Ed. 2d 231, 96 S. Ct. 1048 (1976), the Court appeared to return to the *Vaca* standard. It stated that it could not believe that Congress intended to foreclose a remedy when "the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines,* at 570. Like the language from *Vaca,* this formulation of the duty suggests that either bad faith or arbitrary conduct will be sufficient to establish a breach of the union's duty.

In developing standards to be used in Washington, we must resolve the issue of whether bad faith is an essential element. For the reasons discussed in part IV, we hold that it is not. For now, however, the initial inquiry of whether the doctrine applies to cases arising under our State's counterpart to the NLRA, RCW 41.56, must be addressed.

### III

As noted above, the question of whether a union certified under the provisions of RCW 41.56.080 is required to represent fairly its members has not been decided in this state. For the reasons discussed here, we hold that the doctrine should be applied to disputes arising under this statute.

We start, as did the Court in *Steele v. Louisville & N. R.R.,* 323 U.S. 192, 89 L. Ed. 173, 65 S. Ct. 226 (1944), with the statute which grants the representative the power of exclusive representation. RCW 41.56.080 provides:

> The bargaining representative which has been determined to represent a majority of the employees in a bargaining unit shall be certified by the commission as the exclusive bargaining representative of, and shall be required to represent, all the public employees within the unit without regard to membership in said bargaining representative: . . .

This language parallels that contained in section 9 of the NLRA. Recently, in *State ex rel. Wash. Fed'n of State Employees v. Board of Trustees,* 93 Wn.2d 60, 67, 605 P.2d 1252 (1980), we observed that where Washington's Public Employees Collective Bargaining Act is substantially similar to the NLRA, decisions under that act, while not controlling, are persuasive. *See also Public Empl. Relations Comm'n v. Kennewick,* 99 Wn.2d 832, 664 P.2d 1240 (1983). Our decision to apply this doctrine does not rest, however, on the deference we pay to federal law. We believe, as did the Supreme Court in *Vaca,* that the concept of exclusive representation would be constitutionally impermissible if it left minority members of a craft or union without a means of protecting "their interests or, indeed, their right to earn a livelihood by pursuing the occupation in which they are employed." *Steele,* at 201.

This conclusion is also supported by an explicit reference in the statute. Although the NLRA provides only that the chosen representative shall be exclusive, our state counterpart states that the representative "shall be required to represent . . . all the public employees within the unit without regard to membership in said bargaining representative". RCW 41.56.080. Certainly, if the unions are forbidden from discriminating on the basis of union membership, they should also be prohibited from discriminating on the basis of race or on other grounds. Thus, though the statute explicitly states the union is prohibited from discriminating only as to union membership, we believe this language should be interpreted broadly to impose an affirmative obligation on the part of the union to reconcile, as far as possible, the conflicting interests of its members.

Having determined that the doctrine is applicable to unions certified under the provisions of RCW 41.56.080 (as was the Guild), we must still decide the question of what union activities fall within its scope. The Court of Appeals opinion suggests that the doctrine is restricted to union conduct which clearly implicates either "negotiating, administering or enforcing a collective bargaining agree-

ment." *Allen v. Seattle Police Officers' Guild,* 32 Wn. App. 56, 64, 645 P.2d 1113 (1982) (quoting *Black Musicians v. Local 60–471, Am. Fed'n of Musicians,* 375 F. Supp. 902, 910 (W.D. Pa. 1974), *aff'd,* 544 F.2d 512 (3d Cir. 1976)).

█ The Court of Appeals concluded that it did not see how the petitioners' allegations related to the negotiation or administration of the collective bargaining agreement. We disagree for several reasons. First, unlike the Court of Appeals, we see no bright lines dividing conduct which involves the administration of the collective bargaining agreement from activities which involve intraunion affairs. As the Court has observed, collective bargaining is a continuing process which involves, among other things, day–to–day adjustments in the contract and other working rules, resolutions of new problems and protection of employee rights already secured by contract. *Conley v. Gibson,* 355 U.S. 41, 46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

Second, even if we could distinguish between pure intraunion activities and administration of the collective bargaining agreement, the facts here would lie clearly on the side of administration of the contract. The Guild justifies its position in favor of the white majority by asserting that it is simply seeking to remedy a breach of contract. Finally, we believe the importance of the rights involved in the employment arena and the potential for abuse inherent in majority rule require that the doctrine cover a wide range of union activities.

This view is consistent with that taken by several commentators and the Ninth Circuit Court of Appeals. *See Retana v. Apartment, Motel, Hotel & Elevator Operators Local 14,* 453 F.2d 1018 (9th Cir. 1972). In *Retana,* the court held that the union may have breached its duty by (1) failing to provide bilingual liaisons between Spanish-speaking members and the union, (2) by failing to provide them with a copy of the collective bargaining agreement in Spanish, (3) by failing to explain to them their rights and (4) by failing to seek establishment, through collective bargaining, of a bilingual supervisory system. The *Retana*

court viewed the duty as "broad and demanding" and observed that these factors relate to the day–to–day administration of the collective bargaining contract. *Retana,* at 1023–24. As noted above, the allegations here also relate to the day–to–day administration of the contract. We conclude, therefore, that in deciding to litigate this issue, the union was obligated to consider and represent fairly the interests of *all* its members.

IV

Our conclusion that the duty of fair representation applies to the Guild's conduct does not end our inquiry; we must still decide whether or not the Guild breached this duty. To do so we must return to the issue of what standards are to be used in deciding whether a breach exists. As noted in part III above, it is not clear from the federal cases whether a plaintiff must always prove bad faith or hostility prior to establishing a breach of the duty of fair representation. *Compare Griffin v. UAW,* 469 F.2d 181, 183 (4th Cir. 1972) (without any hostile motive of discrimination and in complete good faith, union may nevertheless pursue a course so unreasonable and arbitrary as to constitute a violation) *with Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290, 293 (7th Cir. 1975) (to prove arbitrary or discriminatory treatment, the plaintiff must show that the union's conduct was intentional, invidious and directed at that particular employee).

Rather than attempting to sort out the multitude of federal cases in the area—a task better left to commentators, *see, e.g.,* Note, *Determining Standards for a Union's Duty of Fair Representation: The Case for Ordinary Negligence,* 65 Cornell L. Rev. 634 (1980); T. Boyce, *Fair Representation, the NLRB, and the Courts* (1978)—we prefer to suggest our own guidelines for this area.

■ As a starting place, we note that the court's description of the duty in *Griffin* is not only the most consistent with *Vaca v. Sipes,* 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967), but also the easiest to apply. In *Griffin,* the

court explained that a union must conform its behavior to each of three separate standards.

> First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

*Griffin,* at 183. We believe this standard best reflects the underlying goal of the duty of fair representation doctrine. That goal has been described as "assuring the individual employee [or minority] that his union will represent his interest unless it conflicts with the group's interest." Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex. L. Rev. 1119, 1155 (1973). Achievement of that goal requires that the doctrine prohibit more than actual malice and subjective bad faith. To achieve this goal, the union must be required to consider individual and minority interests. Likewise, the doctrine demands rational decisionmaking processes. Clark, *supra.*

Having said this, the task is still not completed. Although federal courts have often treated the duty of fair representation as "an unvarying standard to be applied indiscriminately to all phases of the union's actions in representing its members' interests", T. Boyce, at 10, we believe the better rule would allow a certain flexibility to allow union discretion in settling disputes. *See generally* T. Boyce, at 10–70; Clark, at 1155. Because of this court's limited experience in the duty of fair representation area, it would be both difficult and unwise to set out hard and fast rules for all duty of fair representation cases. Thus, we leave further development of the doctrine to future cases and turn our attention to the proper standard to be applied to the facts of this case.

## V

As suggested above, the union activity here involved

administration of the Guild's contract with the City. Yet, clearly this is not a typical contract dispute. It does not raise issues concerning wages, hours of employment or grievance procedures. Instead, it implicates the union's decisionmaking process when it decides to use the resources of its members' common fund to enforce its interpretation of the contract.

■ Furthermore, the dispute pits one group against another, divided—tragically—upon racial lines. We have seen that the duty of fair representation originated as a judicial response to racial discrimination. *See* R. Gorman, *Labor Law* 695–712 (1976). The continued inequalities in our society as well as the potential for abuse of minority rights inherent in majority rule dictates that where, as here, a union's actions raise allegations of racial discrimination, those actions must be closely scrutinized. We hold, therefore that petitioners' allegations establish a prima facie case of breach.

Petitioners would have us go further, however, and rule, as a matter of law, that the Guild's actions are a violation of the duty. Petitioners cite no authority for this unique position but assert that it follows logically from the doctrine's origins. We disagree for the reasons set out below.

Petitioners urge that the Guild's decision to litigate the issue of out of rank order promotions was an action which could benefit only the white majority and it was therefore a per se violation of the Guild's duty to represent all its members fairly. Petitioners' argument has great appeal but oversimplifies the Guild's position. It ignores the fact that any position the Guild takes in this matter will adversely affect a racial group. Here, the Guild took a position against the interests of the minority officers. Before adopting a per se rule, however, we must ask whether, consistent with its duty to represent all its members, the Guild could have taken *no* action. We conclude it could not. Inaction in this case would have put the union in breach of its obligation to the white officers. Failure to act solely to advance

the interests of one faction would as surely violate the duty as action in favor of the other faction. In this case, no neutral position exists. If the Guild believed a contract violation had occurred, an arbitrary refusal to litigate the issue would violate the white majority's right to have its interests considered fairly.

On the other hand, if the Guild's decision to act was based on racist policies, a clear breach would be established.[2] Since the Guild's actions establish a prima facie case of violation, we conclude it must rebut that case by establishing that its actions were not based upon racial considerations. We hold the evidence offered at trial was sufficient to rebut petitioners' case. Our review of the findings of fact entered on this issue thus leads us to the conclusion that the petitioners' evidence did not establish a breach of the Guild's duty.

The court found the following pertinent facts. First, the Guild's past and current contracts provided that hiring and promotional vacancies were to be filled from among the top five eligibles or 25 percent of the total available eligibles. Finding of fact 4.2. Second, the contract provided for a retention of benefits clause. Finding of fact 4.3. Third, for 20 years prior to August 2, 1976, the consistent practice of the City was to hire or promote in order of standing or rank. Finding of fact 4.10. Fourth, the Guild viewed the practice of hiring in rank order as a past practice. Finding of fact 4.11. Fifth, since 1969, the Guild has opposed the out of rank order hiring or promotion of all eligibles, regardless of race or sex. Finding of fact 4.21.

These findings of fact demonstrate that the Guild's decision to litigate the validity of the City's affirmative action program was a good faith, nonarbitrary attempt to represent all its members by seeking enforcement of the

---

[2]Similarly, if the federal lawsuit had been found to be frivolous, we might be willing to infer the action was racially motivated. Although both actions were dismissed on summary judgment, the magistrate specifically held that they were not frivolous.

contract. Although we may view the evidence presented at trial differently from the finder of fact, we cannot substitute our judgment for his. *See St. Regis Paper Co. v. Wicklund,* 93 Wn.2d 497, 503, 610 P.2d 903 (1980). We therefore hold that petitioners have failed to establish a breach of the duty of fair representation on the facts of this case.

This conclusion also disposes of the petitioners' remaining discrimination claims, since the trial court specifically found that the evidence did not support a finding of discrimination.

█ Finally, respondents urge that they should be awarded "terms and damages" because this appeal is frivolous. Respondents' Reply to Amicus Brief, at 19. Respondents' argument has no merit. The appeal was neither *frivolous nor inappropriate, given the fact that it presents questions of first impression in this state. The request is therefore denied.

The Court of Appeals decision is affirmed.

WILLIAMS, C.J., and STAFFORD, BRACHTENBACH, DORE, DIMMICK, and PEARSON, JJ., concur.

DOLLIVER, J. (concurring)—With some reluctance I concur with the majority opinion. Reluctance because were I trying the case, I would find both an underlying hostility, based on race, to the program of selective certification and a lack of good faith in the decision of the Guild to litigate the validity of the affirmative action program of Seattle. I would, therefore, have held that the decision to litigate could not, in the racial context of this case, be called "nonarbitrary." Majority, at 377–78.

However, I was not the trier of fact and our rules and my respect for the trial judge compel me to agree with the majority that there is sufficient evidence to uphold the determination of the finder of fact, the trial court, that the actions of the Guild were not fundamentally determined by racial considerations. The majority is thus correct in its

holding and its statement that "we cannot substitute our judgment for [the finder of fact]." Majority, at 378. *See St. Regis Paper Co. v. Wicklund,* 93 Wn.2d 497, 503, 610 P.2d 903 (1980).

UTTER, J., concurs with DOLLIVER, J.